### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SAMANTHA MARTINEZ,** | |
| **Plaintiff,** | Civ. No. 21-11111 (KM) (AME) |
| **v.** | |
| **CITY OF UNION CITY, UNION CITY POLICE DEPARTMENT, LIEUTENANT MATULEWICZ, AND JOHN AND JANE DOES 1-10,** | **OPINION** |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Samantha Martinez works as a police officer in Union City, New Jersey. She alleges that a higher-ranking officer, Lieutenant Matulewicz, sexually harassed her and discriminated against her on the basis of her gender, creating a hostile work environment. After Martinez complained through the appropriate channels within the police department, she alleges, Matulewicz and his allies waged a retaliatory campaign of intimidation and harassment against her. Throughout the entire ordeal, the department and city leadership allegedly did nothing to protect Martinez from harassment and discrimination. Together, Martinez alleges, the actions of Matulewicz and his allies and the inaction of department leadership violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, and the parallel provisions of the New Jersey Law Against Discrimination, ("NJLAD"), N.J. Stat. Ann. § 10:5–12. Defendants now move jointly to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(6), arguing that it fails to state a claim.

For the reasons set forth below, defendants' motion to dismiss (DE 10) is **DENIED in part** and **GRANTED in part**.

## I.     Background[1]

Martinez is an employee of the Union City Police Department, an arm of the City of Union City, New Jersey. (Compl. ¶ 2, 4.) Martinez works as an Emergency Services Unit ("ESU") Patrolman and, at the time of the complaint, was the only female member of ESU. (*Id.* ¶ 19, 33.) In December 2018, Martinez began to work the "powershift," which lasts from 7:00 p.m. to 3:00 a.m., a time of heightened criminal activity. (*Id.* ¶ 21.) When she began working that shift, she encountered Lt. Matulewicz, the primary alleged harasser. (*Id.* ¶ 23.)

The first alleged incident of harassment occurred on February 29, 2020, when Matulewicz referred to Martinez's direct supervisor, Lt. DeRojas, as Martinez's "boyfriend." (*Id.* ¶ 24.) Martinez objected to this false characterization of her relationship with DeRojas. (*Id.* ¶ 25–26.) She did not report this initial incident, but Matulewicz's harassment only increased. (*Id.* ¶ 27.) At some point thereafter, as Martinez's colleagues informed her, Matulewicz said to DeRojas at his desk that "he hoped she's doing you real good," and "he hoped she's sucking you real good." (*Id.* ¶ 28.) Matulewicz told other officers that Martinez was also engaged in a sexual relationship with another officer, Officer Aviles. (*Id.* ¶ 29–30.) These malicious rumors, which Martinez was repeatedly asked about by her coworkers, caused her anxiety and humiliation. (*Id.* ¶ 30, 99.)

In addition to his alleged sexual harassment, Matulewicz refused to assign Martinez to the ESU truck because of her gender, smearing her as "fake ESU." (*Id.* ¶ 34.) Matulewicz allegedly assigned more junior male officers to the truck and insisted Martinez "will never be on that truck and be ESU." (*Id.* ¶

---

[1]     Certain citations to the record are abbreviated as follows:

        DE = docket entry

        Compl. = Complaint (DE 1)

        Mot. = Defendants' motion to dismiss (DE 10)

        Opp. = Martinez's opposition to the motion to dismiss (DE 14)

37.) Matulewicz continued to harass Martinez after the beginning of the COVID-19 pandemic by sending her out on "report only" calls in contravention of department safety policies (*id.* ¶ 38–40) and by calling her back to headquarters over public radio transmission (*id.* ¶ 41). In June 2020, Sergeant Hernandez, who worked under Matulewicz's command, refused to come to the scene of a contentious traffic stop at Martinez's request, instead belittling her over the radio, and laughing about it at the desk with Matulewicz. (*Id.* ¶ 42, 45.) Martinez documented Hernandez's refusal to respond to the scene in her report, but Hernandez, allegedly assisted by Matulewicz, altered the report to remove the reference. (*Id.* ¶ 42–44.) Martinez learned from coworkers that Matulewicz and Hernandez were conspiring to find ways to punish her. (*Id.* ¶ 46.)

On June 25, 2020, Martinez told a captain of Matulewicz's harassment, discrimination, and retaliation, which the captain reported to internal affairs. (*Id.* ¶ 48, 50.) Martinez was interviewed twice by internal affairs between June 25 and July 2, 2020, and after the interview process, Martinez submitted a comprehensive PD-11 complaint to the Chief of Police. (*Id.* ¶ 51, 53.) Martinez's participation in that confidential internal affairs process was soon broadly known in the department, putting her in fear of further harassment and retaliation. (*Id.* ¶ 54.) On July 7, 2020, Matulewicz was transferred from desk supervisor to the radio room so that he would not have contact with Martinez. (*Id.* ¶ 55.) After participating in the internal affairs interviews, Matulewicz's allies singled out Martinez for reprimands and discipline based on her remaining in her uniform shortly after her shift ended and for following departmental policy in responding to a call. (*Id.* ¶ 59–62.)

In September 2020, Martinez learned from a fellow officer that graffiti in the men's bathroom referred to her as "a rat." (*Id.* ¶ 79.) Later that month, while on a daytime detail, Martinez saw Matulewicz, who had been told not to have any contact with her and should have been in the radio room, drive by her detail twice. (*Id.* ¶ 85.) This intimidation frightened Martinez and she

immediately reported it to internal affairs. (*Id.* ¶ 86.) Shortly thereafter, Martinez was told that more graffiti had appeared in the bathroom, stating that she "records cops." (*Id.* ¶ 87). On October 6, 2020, two department-wide emails were sent, one warning officers against damaging or defacing city property and another reminding officers not to wear their uniforms off-duty. (*Id.* ¶ 88–89.) The next day, the chief of police sent an email to the department that stated, "All personnel are reminded that harassment in any form is unacceptable. It is a violation of our policy and is contrary to our training." (*Id.* ¶ 92.) Two weeks later, the department informed all officers that they were required to take a training course titled "Discrimination and Harassment in The Workplace." (*Id.* ¶ 93.)

A few weeks later, Martinez alleges, Sergeant Armas followed her as she received a ride to the station from another officer, and ran the car's plates in an attempt to intimidate her. (*Id.* ¶ 94–102.) Six months later, Martinez learned that Armas had been disciplined for this incident. (*Id.* ¶ 105.) That same month, Martinez was assigned to a detail with Lt. Ocasio, one of Matulewicz's allies, and learned that a Fraternal Order of Police ("FOP") representative was calling Martinez a "troublemaker" and saying that her supervisors should stick together and retaliate against Martinez whenever possible. (*Id.* ¶ 109, 115.) Martinez did not allow this latest report to be added to her original report, because she feared that making another complaint would lead to increased retaliatory harassment. (*Id.* ¶ 110.) Other officers soon began to spread the idea that Martinez was a troublemaker and that officers should avoid her. (*Id.* ¶ 113, 123.)

On February 12, 2021, Martinez was included in a group text message with a number of other officers, including Matulewicz, as well as the mayor of Union City.[2] (*Id.* ¶ 116, 122.) The message included a number of pictures with captions (inferably intended for circulation as internet memes) that purported

---

[2]    The complaint states that this occurred on "February 12, 2020," but based on the chronology this is presumably a typo.

to criticize the mayor for "protect[ing] his minions" in the police department who harassed Martinez. (*Id.* ¶ 119.) Other memes labeled Martinez as a victim who was being sexually harassed and bullied by other officers. (*Id.* ¶ 120–21.) The sender of the memes is unknown to Martinez. (*Id.* ¶ 122.)[3] Finally, when Martinez attempted to join the FOP, her application was refused because the FOP representative said Martinez "is a rat. She wants to go after supervisors and file complaints against them." (*Id.* ¶ 124.)

On September 17, 2020, Plaintiff completed an EEOC Questionnaire and on February 11, 2021, she received a right to sue letter. (*Id.* ¶ 16, 18.) On May 12, 2021, Martinez filed the complaint in this case. (DE 1.) Count I asserts a claim of sexual harassment and hostile work environment; Count II asserts a claim of gender discrimination; and Count III asserts a claim of retaliation. All three are brought under the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination. They are asserted against the City of Union City and its Police Department, Lieutenant Matulewicz, and John and Jane Does 1-10.

On June 29, 2021, the named defendants moved jointly to dismiss the complaint for failure to state a claim. (DE 10.) Martinez filed an opposition to that motion (DE 14), and defendants filed a reply (DE 16.) This motion is fully briefed and ripe for decision.

## II.   Standard of Review

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations, but it must assert "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the

---

[3]    It is unclear if these memes were a misguided attempt to support Martinez. The implication of the complaint may be that that they were rather a way to draw attention to her complaints, or perhaps provoke retaliation, while maintaining some kind of plausible deniability.

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc). In addition, the "plausibility paradigm announced in *Twombly* applies with equal force to analyzing the adequacy of claims of employment discrimination." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008).

### III.  Discussion

The standards on a motion to dismiss are the same for Title VII and NJLAD claims. *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) ("This Court's discrimination inquiry is the same for claims filed under Title VII and the NJLAD ….") (citing *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 249 (3d Cir. 2006)); *see also Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 941 (3d Cir. 2009) ("New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment actions under Title VII."); *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim."). As relevant here, NJLAD cases adopt the *McDonnell Douglas* framework, which at this stage requires only that the plaintiff present a plausible prima facie case of discrimination. *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999); *Wilkerson*, 522 F.3d at 319.

Employers may be held vicariously liable if individual defendants or other employees performed discriminatory acts within the scope of their employment. *Cardenas v. Massey*, 269 F.3d 251, 265 (3d Cir. 2001) ("An employer is liable for acts committed by its employees in the scope of their employment, which may include some types of disparate treatment of employees by supervisors, such as discriminatory reprimands or job assignments."); *see also Burlington*

6

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–56, (1998). Plaintiff properly alleges, and defendants do not contest, that all discriminatory actions occurred within the scope of employment.

The counts of the Complaint lump Title VII and NJLAD claims, and named defendants, together. This Opinion, however, analyzes the claims and defendants separately. The City of Union City is referred to here as the "City," a designation which includes the Police Department.[4] Claims against the City are discussed in Section III.a, *infra.* Claims against Lt. Matulewicz are discussed in Section III.b. As noted in Section III.c, no action will be taken regarding the unidentified John/Jane Doe defendants at this time.

### a. Claims Against the City

#### i. Count I: Sexual Harassment/Hostile Work Environment

Sexual harassment claims fall broadly into two categories: quid pro quo and hostile work environment. *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 601, (1993). Here, Martinez does not allege quid pro quo harassment, but alleges that the actions of Lt. Matulewicz and others in the department created a hostile work environment in a manner attributable to the City.

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To succeed on a hostile work environment claim, the plaintiff must establish that "1) the employee suffered intentional discrimination because of

---

[4]      The proper defendant is the City of Union City. A New Jersey police department is not an independent entity with the capacity to sue and be sued, but only "an executive and enforcement function of municipal government." N.J. Stat. Ann. § 40A:14–118. The case law uniformly holds that the proper defendant is therefore the municipality itself, not the police department. *See Jackson v. City of Erie Police Dep't*, 570 F. App'x 112, 114 (3d Cir. 2014) ("a city police department is a governmental sub-unit that is not distinct from the municipality of which it is a part") (citation omitted). *See also Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n. 4 (3d Cir. 1997) (Court "treat[s] the municipality and its police department as a single entity for purposes of section 1983 liability").

his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability."[5] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). The first four elements define hostile work environment liability, and the fifth element imposes that liability on the employer. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

I take the five prongs in order.

First, Martinez plausibly alleges that "the alleged hostile acts were 'sex-based' or 'gender-based.'" *Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 576 (D.N.J. 2005) (quoting *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999)). "The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n. 3 (3d Cir.1990), *superseded by statute on other grounds*. "[T]he ordinary tribulations of the workplace," however, "such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" cannot evidence a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In her complaint, Martinez alleges that numerous instances of other officers discussing and speculating on her sexual relationships with superior officers as a result of Matulewicz's malicious rumors. (Compl. ¶ 24, 28, 30, 99.) Matulewicz went so far as to tell Martinez's supervising officer that "he hoped she's doing you real good," and "he hoped she's sucking you real good." (*Id.* ¶

---

[5]     The standard under the NJLAD is phrased slightly differently, but the results are subsumed in the Title VII analysis. To establish a prima facie hostile work environment claim under the NJLAD, a plaintiff must show that the harassment: (1) "would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Lehmann*, 132 N.J. at 603–04.

28.) Although it is not alleged that Matulewicz expressed a gender-based motivation for making such statements, such a motivation may be inferred, in that the statements are sexually explicit and bear an obvious relation to gender. In the context of such sexually explicit remarks, it is also plausible that Matulewicz's other alleged acts of harassment, such as inappropriately sending Martinez out on "report only" calls, radioing her into headquarters, or plotting ways to get her disciplined, were motivated by gender-based hostility. (*Id.* ¶ 38–46.)[6] In addition, it is plausible that the statements about Martinez's supposed sexual relationships were meant to imply that Martinez had gained stature in the department by means of sexual relationships with her supervisors rather than her own merit, which the Third Circuit has held can be a form of sexual harassment. *Spain v. Gallegos*, 26 F.3d 439, 448 (3d Cir. 1994) (concluding that a rumor that a woman gained influence over the head of the office because she was engaged in a sexual relationship with him was sufficient to allow a jury to conclude the woman suffered the harassment alleged because she was a woman); *see also McDonnell v. Cisneros*, 84 F.3d 256, 259–60 (7th Cir. 1996) (concluding that rumors of a woman's "sleeping her way to the top" "could constitute a form of sexual harassment"); *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303 (4th Cir.), cert. denied, 140 S. Ct. 115 (2019) (same).

Second, Martinez has plausibly alleged that the harassment was "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 96 (3d Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The accused

---

[6]     It is somewhat unclear where to draw the line between hostile work environment harassment and retaliatory harassment. It was on June 25, 2020, however, that Martinez first reported Matulewicz's harassment. (Compl. ¶ 48–50.) Before then, a retaliation claim would not arise, because Martinez had not yet engaged in any protected activity. After June 25, 2020, it is plausible that harassment could have been motivated retaliation, sex discrimination, or both. The distinction is not critical at this stage, because Martinez's allegations set forth a prima facie case of either or both.

conduct must be "so severe or pervasive as to constitute an objective change in the conditions of employment." *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 287 (3d Cir. 2010) (citing *Faragher*, 524 U.S. at 787). Courts assessing this prong must examine the totality of the circumstances, including but not limited to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Nuness v. Simon & Schuster, Inc.*, 325 F. Supp. 3d 535, 546 (D.N.J. 2018) (quoting *Mandel*, 706 F.3d at 168).

Martinez has plausibly alleged that the harassment was severe and pervasive. She cites not only numerous sexually harassing comments by Matulewicz, but also rumors that allegedly spread throughout the department over the course of many months. (Compl. ¶ 24, 28, 30, 99). Because the harassment allegedly affected Martinez's reputation generally, the fact that Matulewicz was eventually transferred (*id.* ¶ 55) did not extinguish the negative effect on the conditions of Martinez's employment. Martinez alleges that, in her interactions with fellow officers, she continually was faced with the question of whether they believed the sexual rumors about her, a situation both stressful and humiliating. (*Id.* ¶ 30, 86, 127.) Martinez also alleges several instances of stalking and intimidation from Matulewicz's allies. (*Id.* ¶ 96–102, 114.) Not all of Matulewicz's alleged comments were made to Martinez's face, but the fact that "a plaintiff learns second-hand of a … derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." *Hargrave v. Cnty. of Atl.*, 262 F. Supp. 2d 393, 415 (D.N.J. 2003).

Third, Martinez has plausibly alleged that she was detrimentally affected by the discrimination. This requirement is a subjective one, and "a relatively low hurdle to clear." *Grazioli*, 409 F. Supp. 2d at 578 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)); *Spain v. Gallegos*, 26 F.3d at 449. The plaintiff "must only establish that she subjectively perceived her work environment to be hostile or abusive, and not that she suffered 'concrete

psychological harm.'" *Grazioli*, 409 F. Supp. 2d at 578 (quoting *Harris*, 510 U.S. at 22). Here, Martinez plausibly alleges that she felt anxiety, humiliation and stress because of the sexual harassment, which is a sufficient and plausible allegation. (Compl. ¶ 24, 30, 86, 127, 147.)

Fourth, Martinez has plausibly alleged that the harassment would affect a reasonable person in her circumstances. This test, an objective one, requires the court to "look at all the circumstances," which may "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 280 (3d Cir. 2001) (quoting *Harris*, 510 U.S. at 23). Martinez's allegations easily meet this objective standard. Assuming as I must that the events occurred as she describes them, there is no indication that Martinez overreacted or was unreasonably sensitive. Rather she responded reasonably and took sensible, if unsuccessful, steps to report and stop the harassment. Matulewicz's comments were undeniably inappropriate for any workplace and his harassment served to isolate Martinez and make her a target for the other officers in the department. The harassment allegedly took place over the course of months, and cannot be characterized as "random [and] fleeting," as defendants assert. (Mot. at 12.) Nor can individual comments be brushed aside as "teasing," given the pervasive, repeated, and in some cases vile nature of the harassment. (*Id.* at 11) Moreover, Matulewicz outranked and had authority over Martinez. Although he was not her direct supervisor, he had the power to affect Martinez's working environment. Overall, Martinez has plausibly alleged that the harassment she experienced altered her conditions of work and would have altered the conditions of work of a reasonable person in her position.

Finally, Martinez has plausibly pled facts that would support vicarious liability for the City, her employer. "The basis of an employer's liability for a hostile work environment claim depends on whether the harasser is the

11

victim's supervisor or coworker." *Mandel*, 706 F.3d at 169 (citing *Huston*, 568 F.3d at 104 (3d Cir. 2009)). An employer is vicariously liable to a victimized employee "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Hitchens v. Montgomery Cty.*, 278 F. App'x 233, 235–36 (3d Cir. 2008) (quoting *Faragher*, 524 U.S. at 807). If, on the other hand, "the person charged with creating the hostile environment is the plaintiff's co-worker, and not a supervisor, liability exists [only] where the [employer] knew or should have known of the harassment and failed to take prompt remedial action." *Hitchens*, 278 F. App'x at 236 (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)) (internal quotation marks omitted).

Here, although Matulewicz was not Martinez's direct superior officer, he still occupied "supervisor" status. As a higher-ranking officer and desk supervisor, he had authority over her. For example, it is alleged that he had the power to, and did, send her out on "report only" calls in violation of COVID-19 safety policies, and that he ordered her back to headquarters. (Compl. ¶ 38–39, 41.)[7] Because Matulewicz was a supervisor in relation to Martinez, the City is plausibly alleged to be subject to vicarious liability.

Martinez has thus established a prima facie case of hostile work environment sexual harassment, and the motion to dismiss Count I as against the City is denied.

### ii.  Count II: Sex Discrimination

Next, Martinez alleges that she was discriminated against on the basis of her sex. To establish a prima facie case of race or sex discrimination under Title VII and the NJLAD, a plaintiff must establish that: "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she

---

[7]     Even if we assume that Matulewicz was Martinez's coworker rather than supervisor, she still plausibly alleges that the department failed to take prompt action to remedy his sexual harassment given the tardiness of his transfer to the radio room and the department's failure to take steps to combat the broader harassment Martinez faced by other officers.

suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte*, 636 F. App'x at 842 (citations omitted). Here, the defendants do not dispute that Martinez is a woman and thus a member of a protected class, or that she is qualified for her position. Therefore, the Court need only address the third and the fourth prongs: whether Martinez suffered any adverse employment action and whether that action gives rise to an inference of gender discrimination. Here, Martinez's claim fails because she does not allege that she was subject to an "adverse employment action."

In the context of a disparate treatment claim, "an adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas*, 269 F.3d at 263 (internal quotation marks omitted). In other words, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152–53 (3d Cir.1999) (internal quotation marks omitted). Additionally, an adverse employment action may be found "[i]f an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions...." *Id.* at 153. The standard for an adverse employment action is the same under the NJLAD as under Title VII. *See Tourtellotte*, 636 F.3d at 842–43. This inquiry is separate from the hostile work environment analysis.

Although Martinez catalogues a great deal of harassment and retaliation in her complaint, she alleges only two actions that could potentially qualify as an adverse employment action: Matulewicz's refusal to assign her to the ESU truck, while assigning more junior male employees (Compl. ¶ 34–37), and the unjustified disciplinary writeups (*Id.* ¶ 66, 74). These actions, although adverse in the colloquial sense, do not rise to the level of an adverse employment action within the meaning of the law. Martinez does not allege that she was fired,

demoted, denied a promotion, assigned to a significantly less desirable job, or had her pay or benefits reduced. Courts have repeatedly held that reprimands and disciplinary reports without tangible punishment do not amount to adverse employment actions under Title VII or the NJLAD. Written reprimands and other disciplinary actions can constitute such adverse actions only if they "effect a material change in the terms or conditions of [the] employment." *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 410 (E.D. Pa.), aff'd, 587 F. App'x 731 (3d Cir. 2014) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001), abrogated on other grounds as recognized by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). Although Martinez does allege that the disciplinary actions were part of a retaliatory campaign, as discussed *infra*, she does not allege that they led to any material consequences to her employment, such as pay cuts or suspension.

Similarly, although it may have been against department policy to refuse to assign Martinez to the ESU truck, this action does not rise to the level of an adverse employment action.[8] Courts that have examined the allegedly discriminatory assignment of a police officer to a foot post have found that it does not constitute an adverse employment action. *See, e.g.*, *Guzman v. City of New York*, 93 F. Supp. 3d 248, 259 (S.D.N.Y. 2015); *Roman-Malone v. City of New York*, 2013 WL 3835117 (S.D.N.Y. July 25, 2013); *McQueen v. City of Chicago*, 2014 WL 1715439, at *2 (N.D. Ill. Apr. 30, 2014). Generally, courts have found that a transfer to a "less desirable assignment" that does not affect pay or benefits is not an adverse employment action. *See Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2006); *Revell v. City of Jersey City*, 2009 WL 3152110, at *6 (D.N.J. Sept. 28, 2009), aff'd, 394 F. App'x 903 (3d Cir. 2010); *Dietrich v. City of New York*, 2020 WL 4226591, at *8 (S.D.N.Y. July 23, 2020); *Serna v. City of San Antonio*, 244 F.3d 479, 483 (5th Cir. 2001). Here, Martinez

---

[8]     The complaint does not spell out the significance of being denied an assignment to the ESU truck, but it appears that the alternative is being assigned to a foot post, which an officer might find less desirable.

does not allege that the failure to assign her to the ESU truck led to a demotion, loss of pay, or other major consequence.[9]

Because Martinez did not allege that she was subject to an adverse employment action, she cannot make a prima facie case of gender discrimination, and the motion to dismiss Count II as against the City is granted.

### iii.  Count III: Retaliation

To make out a prima facie case of retaliation under Title VII and the NJLAD, a plaintiff must show "(1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006), as amended (Sept. 13, 2006).

First, Martinez has plausibly alleged that she participated in protected activity when she reported Matulewicz's harassment and discrimination. Protected activity encompasses formal reports of discrimination internally and externally, as well as "informal protests of discriminatory employment practices, including making complaints to management." *Daniels*, 776 F.3d at 193 (quoting *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)). Martinez alleges that she spoke with superior officers, filed internal complaints, and spoke repeatedly to the department's internal affairs division.[10] (Compl. ¶ 47, 51, 53, 71, 76, 81, 86, 103, 107). These are

---

[9]    Assuming *arguendo* that the refusal to assign Martinez to the ESU truck was an adverse employment action, I would find that Martinez does plausibly allege that it resulted from gender discrimination. Matulewitcz's comments that Martinez was "fake ESU" and the fact that he allegedly assigned more junior male officers to the ESU truck does not prove, but in context permits the inference, that he acted from an invidious, gender-based motive. (Compl. ¶ 34, 37.)

[10]    She also later filed an EEOC complaint, but does not allege any retaliation specifically in response to that action.

undoubtedly protected activities, and defendants do not argue otherwise. (Mot. at 15.)

Second, Martinez plausibly alleges that after lodging those protected complaints, she suffered adverse employment actions. For the purposes of a retaliation claim, "adverse employment action" is given a much broader definition than in a discrimination claim. *See Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012) ("A broader definition of adverse action, 'extend[ing] beyond workplace-related or employment-related retaliatory acts and harm,' applies to retaliation claims than to discrimination claims." (quoting *White*, 548 U.S. at 67)). The Third Circuit has also held that subjecting a worker to a hostile work environment in retaliation for protected activity is a sufficient adverse employment action. *See Smith v. RB Distrib., Inc.*, 498 F. Supp. 3d 645, 661 (E.D. Pa. 2020) (citing *Jensen v. Potter*, 435 F.3d 444, 448–50 (3d Cir. 2006)).

Martinez's allegations easily meet the standard for retaliatory acts. She alleges that she was twice castigated as a "rat" after reporting Matulewicz's harassment, once in graffiti and once by the FOP representative. (Compl. ¶ 79, 124.) In other similar cases, the term "rat" has been viewed as evidence of retaliation for making a complaint. In a recent Superior Court of New Jersey Appellate Division case, the court quoted a witness who explained:

> In the law enforcement culture in general ... the term "rat" is perhaps the most derogatory term that can be employed in describing a fellow officer's character.... That "rat" is simply not a true member of the law enforcement fraternity.  The term was employed as a means of inviting retaliatory action against the "rat."

*Kui v. Bergen Cty. Prosecutor's Off.*, 2015 WL 10911493, at *3 (N.J. Super. Ct. App. Div. May 25, 2016); *see also Moore*, 461 F.3d at 336; *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 698–99 (W.D. Pa. 2010); *Perez v. Town of N. Providence*, 256 F. Supp. 3d 139, 153 (D.R.I. 2017).

There was more. Martinez also alleges that Matulewicz and his allies followed her after being told to stay away from her. (Compl. ¶ 96–102, 114.) In

addition, she alleges, they conspired to find ways to get her disciplined as payback for filing complaints against them. (*Id.* ¶ 46, 70, 109.)[11] Together, these allegations reach the level of an adverse employment action under the retaliation standard.

Third, Martinez plausibly alleges that there was a causal connection between the retaliatory actions and her protected activity. On this prong, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action," which can be shown "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" *Hukman v. Am. Airlines, Inc.*, 796 F. App'x 135, 142–43 (3d Cir. 2019) (citations omitted). "Other 'proffered evidence, looked at as a whole, may also suffice to raise the inference' of an employer's retaliatory motive." *Id.* at 143 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).

Here Martinez alleges that the adverse actions were caused by her complaints about Matulewicz's harassment. Both the "rat" and "troublemaker" comments, in particular, may be interpreted as being explicitly directed to Martinez's complaints about Matulewicz's actions. The other retaliatory harassment, she alleges, was also masterminded by Matulewicz, again raising the inference that it occurred in response to her reports. Martinez has established a prima facie case of retaliation. The motion to dismiss Count III as against the City is denied.

### b. Claims against Matulewicz

I turn to the same claims insofar as they are brought against Lt. Matulewicz. As to this individual defendant, the analyses of the Title VII and

---

[11]     The distribution of the memes featuring Martinez may also qualify as evidence of retaliation and a hostile work environment, though their significance is somewhat ambiguous at this time. Presumably more light will be shed on their origin and the aim of their creator during discovery.

NJLAD claims diverge somewhat. All Title VII claims and the NJLAD gender discrimination claim must be dismissed as against Matulewicz. The NJLAD claims of hostile work environment and retaliation, however, survive under an aiding and abetting theory.

### i. Sex discrimination: Count II

As noted above, under both Title VII and NJLAD, to establish a prima facie case of sex discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte*, 636 F. App'x at 842 (citations omitted). As discussed in Section III.a.ii, *supra*, Martinez has failed to properly allege that she suffered an adverse employment action. She therefore could not establish a prima facie case of sex discrimination and her claim against the City was dismissed. For the same reason, her Title VII and NJLAD claims of sex discrimination must be dismissed as against Matulewicz.

The motion to dismiss Count II as asserted against Matulewicz is therefore granted.

### ii. Hostile work environment retaliation: Counts I & III
### (a) Title VII

"Title VII prohibits unlawful employment practices *by employers.*" *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002) (citing 42 U.S.C. § 2000e-2(a); emphasis added). Individual employees are not liable under Title VII, whether in their personal or official capacities. *Id.* (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077–78 (3d Cir. 1996)); *Gretzula v. Camden Cty. Tech. Sch. Bd. of Educ.*, 965 F. Supp. 2d 478, 485 (D.N.J. 2003) (citations omitted); *see also Cardenas*, 269 F.3d at 268 (3d Cir. 2001) ("[C]laims against individual supervisors are not permitted under Title VII."). Martinez's agency theory of liability (Opp. at 14–15) is therefore contrary to the clear meaning of the statute.

The motion to dismiss is therefore granted as to Count I (hostile work environment) and Count III (retaliation), insofar as those counts are asserted as Title VII claims against Matulewicz.

### (b)  NJLAD

The NJLAD, like Title VII, imposes liability on "employers," N.J. Stat. Ann. § 10:5-12(e), but NJLAD also makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act." N.J. Stat. Ann. § 10:5-12(e). Aiding and abetting amounts to a mechanism for imposing personal liability for a violation of the NJLAD. *See Cicchetti v. Morris Cnty. Sheriff's Office*, 194 N.J. 563 (2008) ("individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can . . . arise through the 'aiding and abetting' mechanism."). Cases interpreting the NJLAD have occasionally embraced the "awkward" theory that an individual can aid and abet, not only the conduct of another, but that person's own acts of discrimination *qua* supervisor. *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999) (abrogated on other grounds); *Ivan v. County of Middlesex*, 595 F. Supp. 2d 425 (D.N.J. 2009); *O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 467 (D.N.J. 2016).

Aiding and abetting "require[s] active and purposeful conduct." *Tarr v. Ciasulli*, 181 N.J. 70, 83, 853 A.2d 921, 929 (2004). Simply having responsibility over employees and the workplace, or failing to protect an employee from discrimination, falls short of that standard. *Cicchetti*, 947 A.2d at 646. For an individual defendant to be liable under NJLAD as an aider and abettor, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Hurley*, 174 F.3d at 127 (cleaned up).

19

As discussed above, I have found that Martinez has plausibly stated a claim that Matulewicz sexually harassed her, created a hostile work environment, and retaliated against her for complaining about his actions. There is every indication that he was aware of what he was doing and must have understood that his actions likely violated anti-discrimination laws. Finally, as the perpetrator of the principal violation, he knowingly and substantially assisted in it. Thus, having already found above that Martinez has stated NJLAD claims against the City for hostile work environment and retaliation, I find also that she has stated parallel NJLAD claims against Matulewicz for aiding and abetting those acts.

The motion to dismiss is therefore denied as to Counts I (hostile work environment) and III (retaliation), insofar as they are asserted as NJLAD claims against Matulewicz.

### c.  Claims against John and Jane Doe defendants

The John/Jane Doe employee defendants have not yet been identified, and their discriminatory acts, if any, cannot be determined from the complaint. Dismissal, however, would be premature in advance of discovery. For the present, the court will permit the John/Jane Doe parties to remain in the caption; should the plaintiff wish to pursue such allegations further, she may attempt to do so by means of a motion to amend her complaint.

### CONCLUSION

Defendants' motion to dismiss the complaint (DE 10) is therefore **GRANTED IN PART and DENIED IN PART.**

As to Count I, the motion to dismiss is **GRANTED** with regard to the Title VII claim against Matulewicz and is otherwise **DENIED.**

As to Count II, the motion to dismiss is **GRANTED.**

As to Count III, the motion to dismiss is **GRANTED** with regard to the Title VII claim against Matulewicz and is otherwise **DENIED.**

As to the unidentified Jane/John Doe defendants, no action will be taken at the present time.

The Union City Police Department will be dropped as a separate defendant.

An appropriate order follows.

Dated:  November 8, 2021

/s/ Kevin McNulty

_____

Kevin McNulty
United States District Judge