IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMANTHA MARTINEZ,<br><br>                              Plaintiff,<br><br>v.<br><br>CITY OF UNION CITY,<br>UNION CITY POLITICE DEPARTMENT,<br>LIEUTENANT MATULEWICZ, AND JOHN<br>AND JANES DOES 1-10<br>(hereinafter "Defendants"),<br><br>                              Defendant, | Jury Trial Demanded<br><br><br>*Civil Action*<br><br><br><br>AMENDED COMPLAINT |

## **CIVIL ACTION**

Plaintiff, Samantha Martinez, (hereinafter "Plaintiff"), by and through her attorney, Herbert & Weiss, LLP, brings this civil matter against the City of Union City, Union City Police Department, Lieutenant Matulewicz, and John and Jane Does 1-10 (hereinafter "Defendants"), for violations of Title VII of the Civil Rights Act and the New Jersey Law Against Discrimination ("NJLAD"). In support thereof, Plaintiff alleges as follows:

## **PARTIES**

1.      Plaintiff is a Hispanic female and citizen of the United States of America and the State of New Jersey, who currently resides at 307 Bergenline Avenue, Apt. 2D, Union City, New Jersey 07087.

2.      Defendant is the City of Union City (referred to herein as "Defendant" or "City") at all times herein mentioned is a government entity organized and existing under the laws of the State of New Jersey, with its principal place of business located 3715 Palisade Avenue, Union

City, New Jersey 07807, and Plaintiff's employer. Defendant the Union City Police Department (referred to herein as "Defendant" or "Department") at all times herein mentioned is an arm of the City of Union City, headquartered at 3715 Palisade Avenue, Union City, New Jersey 07807. The City funds, staffs, supervises and otherwise controls the operations of the Department.

3.      Defendant Lietenant Matulewicz (referred to herein as "Defendant" or "Lt. Matulewicz") at all times herein mentioned is a male employee of Union City and the Department, in a higher rank than Plaintiff.

4.      At all times pertinent to this Complaint, Plaintiff was an "employee" of Defendant Union City and the Department, headquartered at 3715 Palisade Avenue, Union City, New Jersey 07807, in the County of Hudson, within the meaning of 29 USC Section 630(f) and Section 10:5-5(5) (f) of the New Jersey Law Against Discrimination ("LAD").

5.      At all times relevant to this lawsuit, Defendant were and are a "person" and an "employer" within the meaning of 29 USC Sections 630(a) and (b) and Sections 10:55(5)(a) and (b) of the LAD. At all times relevant to this lawsuit, Plaintiff was a regular full-time employee of Defendants Union City and the Department.

6.      Defendants, the City and the Department, are liable for the acts alleged herein either as the direct employer of Plaintiff, the direct-acting party, and/or as a responsible party for the acts of their employees under the doctrine of Respondent Superior.  All actions alleged against Defendants the City and the Department were carried out under the color of state law.

7.      Defendants John and Jane Does 1 through 10 are or were at all relevant times employees of the City and/or Department or are or were employed or appointed by the Department and/or the City and/or were elected officials in the City.  These John and Jane Does also include persons who are or were agents of the Department and/or the City or whose conduct

was intended to further the unlawful and/or discriminatory, harassing, and retaliatory efforts of these Defendants.  Said Defendants are fictitiously named herein inasmuch as their current identities are unknown to Plaintiff.

8.      These fictitiously named Defendants are listed herein based upon their acts of performing overt violations of civil rights, of punishing Plaintiff for the lawful exercise of his civil rights, of failing to report acts of clear deprivation of Plaintiff's civil rights and/or creating a hostile work environment.  Any and all allegations against any of the specifically named Defendants should be deemed to include and list these fictitiously named Defendants automatically by reference.  As the true identities of these Defendants are made known to Plaintiff, said John and Jane Doe Defendants shall be designated by proper name.

9.      All Defendants and their officials, agents and/or employees engaged in acts of civil rights violations, discrimination, harassment, and retaliation directed toward Plaintiff and/or failed to prevent co-workers, superiors and subordinates of Plaintiff from engaging in conduct that was obviously discriminatory, harassing, and retaliatory in nature toward Plaintiff. Defendants and their officials, agents and/or employees acted and/or failed to act when action was required and created a hostile work environment which caused harm to Plaintiff.

10.     The causes of action alleged seek to protect the right to be free from unlawful employment practices and to redress the deprivation of civil rights under the color of state and federal law and of rights secured by Title 7 of the Civil Rights Act of 1964, and by the New Jersey Constitution, and the statutory and common laws of the State of New Jersey, and to recover damages, costs, and attorney's fees under the New Jersey Law Against Discrimination (NJLAD") and the Conscientious Employee Protection Act ("CEPA").

11.     The actions (and inactions) and conspiracies alleged herein were engaged in and carried out by the City and the Department acting by and through their employees, agents, officials and co-conspirators pursuant to policy, practice and custom and under color of law.

12.     Plaintiff asserts that the City and/or the Department have engaged in repeated practices of employment discrimination, harassment, and retaliation, which includes among other things disparate treatment, heightened scrutiny, the selective enforcement of discipline and punitive policies, adverse employment decisions, diminution of responsibilities, stripping of command positions with concomitant losses of overtime, promotional denials, the imposition of civil rights violations, failure to address his complaints, retaliation for his whistleblowing activity and protected speech, an ongoing hostile work environment, and continued efforts to malign his character and professional reputation with an intent of obstructing his future employment opportunities.

## JURISDICTION

13.     Because Plaintiff asserts sex and race discrimination along with retaliation claims arising under Title 7 of the Civil Rights Act of 1964, this Court has jurisdiction over this controversy, the authority to empanel a jury to decide its facts, and the authority to order any and all appropriate legal and equitable relief for any violations of law found. Title 28 USC Section 1367(a) grants this Court jurisdiction to adjudicate Plaintiff's claims arising under New Jersey Law Against Discrimination claims pursuant to N.J.S.A. 10:5-1 et. seq ("LAD") and Plaintiff hereby requests that the Court so assert this jurisdiction.

## VENUE

14.     Pursuant to 28 USC Section 1391(b) (2) and LAD, venue is proper in this Court because all of the events giving rise to Plaintiff's claims occurred in this Judicial District.

15.    For purposes of Plaintiffs' Title VII claims, Plaintiffs have exhausted their administrative remedies with the Equal Employment Opportunity Commission and have received their "Right-to-Sue" letters from that agency.

## PROCEDURAL HISTORY

16.    On or about September 17, 2020, Plaintiff completed an Equal Employment Opportunity Commission ("EEOC") Questionnaire ("Questionnaire") and submitted it to the Director of the New Jersey District Office.

17.    The Charge alleged sex and race discrimination along with retaliation claims.

18.    On or about February 11 2021, the EEOC issued a Right to Sue Notice.

## STATEMENT OF FACTS

19.    Plaintiff has been employed as an Emergency Services Unit ("ESU") Patrolman by Union City and the Department since January 3, 2013. Plaintiff is the only female ESU officer in the Department.

20.    Plaintiff has, at all times, performed her duties diligently.

21.    In or around December 2018, Plaintiff began working the "powershift" tour, with working hours of 7:00 p.m. to 3:00 a.m.

22.    Prior to working the powershift, Plaintiff had little interaction with Lt. Matulewicz.

23.    However, since Plaintiff began working the powershift, Lt. Matulewicz began a campaign of discrimination, harassment, and creating/sustaining a hostile work environment.

## SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

24.     On February 29, 2020, while at the police desk, Lt. Matulewicz intentionally and maliciously referred to Plaintiff's direct supervisor, Lieutenant DeRojas, as Plaintiff's "boyfriend," telling Plaintiff that "her boyfriend's not here today," causing Plaintiff extreme embarrassment and humiliation.

25.     In response to Lt. Matulewicz, Plaintiff, visibly upset by Lt. Matulewicz's inappropriate and unwelcome comment, asked him "what?" to which he repeated "your boyfriend's not here today."

26.     At that point, Plaintiff felt compelled to respond "that's not my boyfriend," and immediately left the police desk area and went outside of headquarters where her fellow officers were convened.

27.     Plaintiff's fellow officers recognized Plaintiff's extreme upset, and after prompting her, she revealed the incident with Lt. Matulewicz. At that time, she was advised to document the incident but she did not want to cause any problems for Lt. Matulewicz so she chose not to file a complaint against him.

28.     Unfortunately, Lt. Matulewicz's conduct became even more egregious, as he made derogatory comments about Plaintiff, and continued to make explicit comments regarding Plaintiff's alleged sexual activity with her supervisor, Lt. DeRojas, to other patrolmen and supervisors in the Department. Specifically, Plaintiff learned that Lt. Matulewicz exclaimed to Lt. DeRojas that "he hoped she's doing you real good," and "he hoped she's sucking you real good," while at the police desk. Plaintiff's colleagues reported Lt. Matulewicz's comments to her, after which she felt humiliated and concerned about future interactions with Lt. Matulewicz.

29.     Lt. Matulewicz continued to degrade Plaintiff by intentionally and maliciously making additional comments to other officers and supervisors regarding Plaintiff's alleged

sexual activity. Specifically, Lt. Matulewicz alleged that Plaintiff was having sex with fellow officer Aviles.

30.     Lt. Matulewicz's allegations of Plaintiff's sexual relationship with Officer Aviles quickly spread throughout the Department. Many of Plaintiff's colleagues questioned her about her alleged sexual relationship with Officer Aviles, causing Plaintiff anxiety and humiliation.

31.     Lt. Matulewicz also made it known to other officers that he was making sector assignments specifically to keep Plaintiff and Officer Aviles separated because of their alleged sexual relationship.

32.     Throughout this time, Plaintiff was also subjected to inappropriate sexual comments during lineup/roll call, where Lt. Matulewicz often spoke in a sexually explicit manner to other officers, often speaking of sperm, which he referred to as "juices" when making commentary to those who workout or body build.

## SEX DISCRIMINATION

33.     In addition to the unwanted and inappropriate sexual comments made to Plaintiff or about Plaintiff to others, or in front of Plaintiff, Lt. Matulewicz routinely disparaged Plaintiff's position within the Emergency Services Unit, and refused to assign her to the ESU truck when she worked during his shift, solely because she is the only female member of ESU.

34.     Lt. Matulewicz degradingly referred to Plaintiff as "fake ESU" while at the police desk, and in front of his desk clerk.

35.     Plaintiff underwent a rigorous selection process in order to qualify for ESU, and her accomplishment has been tarnished by Lt. Matulewicz's claims that she is "fake ESU" because of her gender.

36.     Upon information and belief, Lt. Matulewicz failed to qualify for ESU.

37.     When Lt. Matulewicz was her tour commander, Lt. Matulewicz made discriminatory assignments based upon Plaintiff's gender when he refused to assign Plaintiff to the ESU truck, stating "she will never be on that truck and be ESU" despite her seniority and assigning a junior male ESU officer to the truck.

**ADDITIONAL HARASSMENT**

38.     Lt. Matulewicz also refused to follow Order No. 2020-07, outlining specific preventative measures for officer safety during the COVID-19 pandemic, with respect to Plaintiff.  The Order mandated that officers would not be sent out on "report only" calls, however, Lt. Matulewicz twice sent Plaintiff out, or caused her to be sent out, on "report only" calls during her shift on March 28, 2020. After being sent out the first time, Plaintiff contacted the desk supervisor, Lt. Matulewicz, by phone addressing being sent out on a "report only" call in spite of Order No. 2020-07. He took no action to rectify the issue with Communications, so Plaintiff prepared a PD-11 report to document the issue. Plaintiff provided Lt. Matulewicz with the PD-11, but did not forward it to the Chief's Office.

39.     Despite Plaintiff addressing this with Lt. Matulewicz, she was sent out on another "report only" call soon thereafter. Plaintiff completed a second PD-11, but did not forward it to the Chief's Office.

40.     Following Plaintiff's attempts to address this issue with Lt. Matulewicz, and despite the fact that she had not elevated her concerns up the chain of command, she learned that he was attempting to retaliate against her by finding a reason to formally write her up.

**CONTINUED HARASSMENT AND RETALIATION**

41.     Lt. Matulewicz continued to intentionally and maliciously embarrass Plaintiff by repeatedly calling her in to headquarters via radio transmission, despite her direct supervisor

being on duty. Specifically, on April 24, 2020, Lt. Matulewicz called in officers to report about police vehicles, however, Plaintiff was the only officer from the powershift to be called in by Lt. Matulewicz, and the only officer to be called in multiple times via radio transmission. When Plaintiff arrived at headquarters, she learned that Lt. Matulewicz again had been making derogatory comments about her at the police desk.

42.     On June 21, 2020, Sergeant Lester Hernandez, under Lt. Matulewicz's command, refused to come to a scene at Plaintiff's request. Plaintiff requested a supervisor's presence at a traffic stop involving the City Department of Public Works ("DPW"), where the DPW workers were threatening to contact the Mayor over the traffic stop. Instead of responding to the scene after Plaintiff briefed him on the situation, Sgt. Hernandez belittled her over the radio, and did not show up. Plaintiff's supervisor, Lt. DeRojas, then contacted her and advised her how to proceed.  Because Sgt. Hernandez is under Lt. Matulewicz's command, it was clear that this was part of Lt. Matulewicz's harassing and retaliatory conduct. Plaintiff then completed her official report regarding the traffic stop, noting that a supervisor was requested but did not respond to the scene. Plaintiff's supervisor, Lt. DeRojas, approved her report.

43.     On June 25, 2020, Plaintiff reported for duty and while at headquarters learned that on June 24, 2020, Sgt. Hernandez had accessed her June 21, 2020 report and "rejected" the report, despite it being previously approved by Lt. DeRojas. Sgt. Hernandez also made comments on Plaintiff's report. It was clear that Sgt. Hernandez was angry about her accurately reporting that he failed to arrive on scene following her request.

44.     On information and belief, Sgt. Hernandez does not have the credentials necessary to "reject" a report, but would have had needed a lieutenant with access to provide him the access codes. Coincidentally, Sgt. Hernandez had been working the prior day with Lt.

Matulewicz. Plaintiff later learned from Internal Affairs that Lt. Ocasio admitted giving the access codes to Lt. Matulewicz.

45.     Plaintiff also learned that on June 21, 2020, Lt. Matulewicz and Sgt. Hernandez had been at the police desk together while she was calling in for a supervisor, and that they were laughing at her requests.

46.     Plaintiff then learned that both Lt. Matulewicz and Sgt. Hernandez had been asking other officers about her work habits and if she was leaving early or coming late – any behavior that would constitute grounds for a write-up. It was then that Plaintiff realized Lt. Matulewicz and Sgt. Hernandez were conspiring against her. Plaintiff became terrified of what they might try to do to her in retaliation.

47.      Shortly thereafter, Plaintiff was called in by Captain Botti to discuss Sgt. Hernandez's rejection and changing of her June 21, 2020 report.

48.     It was during this June 25, 2020 meeting that Plaintiff told Captain Botti that Lt. Matulewicz had been sexually harassing her, discriminating against her, and creating a hostile work environment, since February 2020.

49.     It was also during this meeting that Plaintiff was informed that Sgt. Hernandez would be instructed not to engage directly with her in the future, but to speak with her supervisor.

50.     On information and belief, Captain Botti reported to Internal Affairs that Plaintiff alleged Lt. Matulewicz was sexually harassing her, discriminating against her, and creating a hostile work environment.

51.     Between June 25, 2020 and July 2, 2020, Plaintiff was twice called in by Internal Affairs to be interviewed about her complaints against Lt. Matulewicz. Internal Affairs notified Plaintiff that each interview was being recorded.

52.     Plaintiff appeared for each interview at Internal Affairs accompanied by a PBA representative. At no time did Internal Affairs request a written statement from Plaintiff.

53.     Because she had not provided a written statement during the Internal Affairs interview process, on July 2, 2020, Plaintiff submitted a comprehensive PD-11 in the form of a letter to Chief N. Luster.

54.     Despite the required confidentiality of Internal Affairs complaints and investigations, news of Plaintiff's Internal Affairs complaint against Lt. Matulewicz was known department-wide.  Plaintiff was terrified of being further retaliated against, and became increasingly anxious about work.

55.     On July 7, 2020 Plaintiff learned that Lt. Matulewicz would no longer be working as desk supervisor because he was transferred to Communications (also known as the Radio Room.) She learned this was done so that she and Lt. Matulewicz would not have any contact. Lt. Matulewicz was not subsequently moved until a week later.

56.     Generally, ESU members respond to any "hot job" or "high priority job," including leaving their assigned to other posts, such as a foot post, to respond to the job.

57.     As a member of the ESU, Plaintiff responds to high priority jobs.

58.     As a member of the ESU, Plaintiff responds to "hot jobs"

59.     On or around July 20, 2020, while Plaintiff was on a foot post, a high priority call came over the radio. Fellow ESU Officer Tavares picked up Plaintiff to bring her to the call. Upon arrival, Sgt. Lester Hernandez singled out Plaintiff, the only female ESU member, for

leaving her foot post to come to the "hot job" while a number of other ESU members had also responded to the scene.

60.     Plaintiff was the only ESU member to be reprimanded for arriving on scene on July 20, 2020.

61.     On information and belief, Lieutenant Sierra, who replaced Lt. Matulewicz as Tour Commander for the 4:00 p.m. -12:00 a.m. shift, sent out a memorandum instructing all night shift supervisors that Plaintiff was expected to respond to all ESU calls regardless of her assigned post. The subject line of this email was "P.O. S. Martinez," making the email specific to Plaintiff.

62.     On August 14, 2020, Plaintiff remained in her uniform and at her scheduled post after her shift ended, as was typical of her fellow officers. At the time, she was speaking with a fellow police officer, P.O. Aviles, when Lieutenant Ocasio drove past Plaintiff and, rather than stop to talk to her, went back to headquarters and directed another supervisor, Sergeant Armas, to drive by her and tell her she is "in trouble" and that she needed to return to headquarters and "leave paper."

63.     While Plaintiff was speaking with P.O. Aviles, Plaintiff received a call from Sergeant Nunez where she communicated her location.

64.     Plaintiff returned to headquarters as instructed by Sgt. Armas, where she was met by Sgt. Nunez who indicated to her she needed to complete a PD-11.

65.     Sgt. Nunez indicated to Plaintiff that he was directed by Lt. Ocasio to get Plaintiff's PD-11.

66.     On information and belief, no fellow police officers had even been asked to write a PD-11 for, or received any form of discipline for, remaining in uniform after their shift ended.

67. Lt. Ocasio was targeting Plaintiff as retaliation for her complaints against Lt. Matulewicz, as they are known to be close friends.

68. Lt. Ocasio and Capt. Botti were aware that P.O. Aviles was the officer to whom Plaintiff was speaking on August 14, 2020.

69. On information and belief, P.O. Aviles was instructed to write a PD-11 about the incident.

70. On information and belief, P.O. Aviles submitted his PD-11, which Capt. Botti and Lt. Ocasio coerced him into rewriting with additional information suggested to him, before accepting his PD-11. Specifically, Capt. Botti and Lt. Ocasio were insisting that P.O. Aviles include the exact time that he was with Plaintiff, however, P.O. Aviles was unaware of an approximate time frame, which he indicated in his original PD-11. It was clear that Capt. Botti and Lt. Ocasio were looking for grounds to discipline Plaintiff.

71. Capt. Botti informed Plaintiff that she would receive some form of discipline, but Plaintiff went to Internal Affairs to report the incident because she was being retaliated against by Lt. Ocasio.

72. On information and belief, P.O. Aviles was never interviewed by Internal Affairs relative to his being coerced into rewriting his PD-11.

73. Plaintiff was requested to submit an additional PD-11 by Capt. Botti with regard to the same incident to further explain why she remained in her uniform after her shift. Plaintiff explained that on numerous occasions, she has remained in her uniform after her shift was over and supervisors have witnessed her return to headquarters after her scheduled hours to return keys and equipment. On those occasions, Plaintiff was never questioned or reprimanded.

74.     Plaintiff reported the incident to Internal Affairs. Internal Affairs advised Plaintiff, that she would be disciplined, and that the disciplinary measure would be listed in the "Guardian Tracking System" as "counseling."

75.     The Guardian Tracking System is where supervisors enter the officers' disciplinary records, as well as department award recommendations within the department. Although counseling does not reflect in the Guardian Tracking System as a write-up, it is still a negative record.

76.     Plaintiff advised Internal Affairs that she thought discipline in this instance was retaliatory due to Lt. Ocasio's relationship with Lt. Matulewicz. Plaintiff then asked if she should contact her attorney, and was advised that she should.

77.     Less than an hour later on the same day, Plaintiff was contacted by Internal Affairs and advised that the disciplinary counseling would not be entered into the Guardian Tracking System, and they would instead make a note for themselves.

78.     Lt. Ocasio was then moved to supervise a different squad that Plaintiff was not on, however, he remained on the same shift and Plaintiff still saw him during her shifts.

79.     On or about September 2020, Plaintiff was made aware by another officer that there was a writing etched into one of the stalls in the men's bathroom inside the department that read "Sam is a rat."

80.     On or about September 24, 2020 Plaintiff reported this incident to Internal Affairs.

81.     Plaintiff and Internal Affairs had a meeting to discuss this incident along with another incident that occurred while she was on duty.

82.     During the meeting, Plaintiff's PBA representative was present.

83.     During a daytime detail on or about September 24, 2020, Plaintiff became visibly aware that Lt. Matulewicz passed by while she was handling a detail.

84.     Plaintiff was previously notified that Lt. Matulewicz would no longer be handling any part of her position directly or indirectly.

85.     After being notified that he should not maintain any contact with Plaintiff, and being reassigned to the communications room, Lt. Matulewicz passed by her detail two times on 14th and Manhattan.

86.     A sergeant was already assigned to Plaintiff's detail as a supervisor, which does not require that additional supervisors are present on the same detail. Since Lt. Matulewicz was assigned to the communications room, there was no reason for him to be on patrol. Lt. Matulewicz's intended intimidation made Plaintiff sick to her stomach, triggering stress and anxiety because she feared he would be looking for reasons to retaliate against her. Plaintiff immediately contacted a PBA representative and reported this incident directly to Internal Affairs.

87.     Following the aforementioned incident, Plaintiff was made aware that more writing was found on the Union City Police Department men's bathroom stall which said, "Samantha records cops." Plaintiff reported the second graffiti to Internal Affairs, while simultaneously questioning their inaction after the first graffiti was reported. Plaintiff communicated to Internal Affairs that she did not feel protected and feared that something similar would reoccur if no further action was taken.

88.     Following Plaintiff's report, on October 6, 2020, Memo 2020-114 was sent as a department-wide email to address "Inappropriate Behavior and Damage to City Property," and that anyone caught defacing police department property will face discipline.

89.     On the same date, Capt. Botti sent a separate email to all members of the department to remind all that the wearing of police uniforms off-duty without the express permission of the Chief of Police is strictly prohibited.

90.     On the same date, Capt. Botti a third email was sent to the department regarding "End of Shift Relief Announcement & Officer Equipment Inspection," which outlined the requirement for all officers working patrol and the power shift to report to headquarters before and after their shifts for accountability and uniform inspection purposes.

91.     On October 7, 2020 Capt. Botti sent another email instructing all officers that bathrooms should be inspected for "damage & graffiti" and any damages should be documented and reported.

92.     On the same date, Chief Luster sent a follow-up email to the department stating, "All personnel are reminded that harassment in any form is unacceptable. It is a violation of our policy and is contrary to our training."

93.     On October 21, 2020 an email was sent to the entire department advising all employees that the required "Discrimination and Harassment in The Workplace" training course and test were available. This training course was mandatory for all sworn officers and civilian employees.

94.     On November 4, 2020, Plaintiff was assigned to the Housing 2/Washington Park post in Union City to conduct checks. At approximately 2:35 a.m. Plaintiff proceeded to 23rd Street and Kerrigan Avenue to dock the police vehicle to complete her shift.

95.     Plaintiff needed transportation to return to headquarters after docking her police vehicle. Plaintiff asked P.O. Ascencio, who at that time was off duty.

96.     While on her way to headquarters, Plaintiff was contacted on the radio at about 2:47 a.m. to make a "10-12" to headquarters. Plaintiff advised she was en-route, traveling north on John F. Kennedy Boulevard until 38th street.

97.     While en-route, Plaintiff observed Sgt. Armas' supervisor police vehicle exit from an Ihop parking lot on John F. Kennedy Boulevard and seemingly try to get close enough to P.O. Ascencio's vehicle to run the license plates.

98.     Plaintiff arrived at headquarters at 2:50 a.m. Upon arrival, Plaintiff was stared at by those already in headquarters as she turned in her equipment.

99.     After leaving headquarters, Plaintiff was advised by Special Officer Erazo that there were discussions before her arrival to headquarters regarding her whereabouts, and references made about her relationship with P.O. Aviles, although none existed.

100.    Plaintiff was also advised by Sp.O. Erazo that Sgt. Armas requested that the desk clerk run the license plate number of the car she was traveling in to get back to headquarters. On information and belief, Sgt. Armas specifically asked that the desk clerk run the license plate number of the vehicle that he attempted to run on John F. Kennedy Boulevard.

101.    On information and belief, Sgt. Armas was making disparaging comments relating to Planitiff and P.O. Aviles, even going as far as asking the desk clerks and other officers what type of personal vehicle P.O. Aviles drives.

102.    After being informed of the incident, Plaintiff returned to headquarters and requested to speak with Lieutenant Mordan. Lt. Mordan was not Plaintiff's direct supervisor, but the direct supervisor was Lt. Ocasio, who Plaintiff could not report to because of her previously reported fear of further retaliation by Lt. Ocasio. Sgt. Armas was present during this conversation with Lt. Mordan.

103.     During the meeting, Plaintiff addressed Sgt. Armas directly and asked if he had a problem with her due to his actions that evening. After recounting the events that took place that evening to Lt. Mordan, Sgt. Armas denied having attempted to run the license plates because he witnessed Plaintiff enter the vehicle and knew that she was in the vehicle. However, it would not have been possible for Sgt. Armas to have witnessed Plaintiff enter the vehicle if he was stationary at the Ihop parking lot.

104.     During the conversation, after relentlessly denying Plaintiff's claims to Lt. Mordan, Sgt. Armas admitted that when he exited the Ihop parking lot he tried to run the plates on the vehicle Plaintiff was in. Sgt. Armas also apologized and admitted he was wrong for entering headquarters and requesting that the license plate numbers be run by the desk clerks.

105.     At the end of the meeting, Lt. Mordan indicated to both Plaintiff and Lt. Armas that a PD-11 must be submitted. On April 15, 2021, Plaintiff received a letter from Internal Affairs that Sgt. Armas was investigated and found in violation of departmental rules and regulations, and that he would be subject to discipline.

106.     In Plaintiff's PD-11 she indicated that she is undergoing "horrific working conditions" and "should not have to face a battle in my workplace every day."

107.     Later that evening, Plaintiff was called to Internal Affairs at 7:30 p.m. Plaintiff reported to Internal Affairs at 7:30 p.m. with PBA representative, Detective Molina. Lt. Bergbaueradvised Plaintiff that, moving forward, Plaintiff would be required to make a recorded oral statement instead of writing a PD-11 statement. Plaintiff was unaware of any changes to reporting policies requiring the use of recorded statements.

108.     Plaintiff was interviewed by Detective Sgt. Melendez, who asked Plaintiff how she normally gets to and from headquarters after docking her police vehicle. Plaintiff advised

Det. Melendez that common practice is officers ride with other officers who are going back to

headquarters or going to the same lot, or they will call-in to get a ride, if needed. However, the

practice is not improper nor prohibited by the department. Plaintiff explained to Det. Melendez

that Sgt. Armas's actions were a personal vendetta against Plaintiff after her previous incident

involving him and P.O. Aviles.

109.    On November 9, 2020, Plaintiff was assigned to a detail with Lt. Ocasio. Lt.

Bergbauer from Internal Affairs reached out to Plaintiff to see if everything was ok on the detail,

and if she had any concerns, she should report to a supervisor. Plaintiff reported to Lt. Bergbauer

that Lt. Gaston, a Fraternal Order of Police ("FOP") representative, was going around the

department calling Plaintiff a troublemaker. Because Lt. Gaston is an FOP representative, he

represents all of the lieutenants and sergeants who are supervisors, including Lt. Matulewicz, Lt.

Ocasio, and Sgt. Armas. Lt. Gaston was going around saying that supervisors should stick

together, insinuating that the supervisors should discipline Plaintiff any chance they get.

110.    Lt. Bergbauer offered to call Plaintiff on a recorded line so that this report could

be added to her original complaint. However, Plaintiff rejected Lt. Burbauer's offer because she

was afraid that another report or investigation of another officer would make matters worse

within the department and she would suffer further retaliation.

111.    Lt. Bergbauer told Plaintiff he was concerned with confidentiality being broken,

and suggested that Plaintiff not come to his office anymore. Instead, Lt. Bergbauer gave Plaintiff

a different phone number to contact him on if she needed to report to him.

112.    On November 10, 2020, Plaintiff was on a detail with P.O. Gaston and he asked

Plaintiff why it is that people don't want to be around her. P.O. Gaston proceeded to say that he

was told by people in the department to stay away from Plaintiff and not to trust her.

113.    Plaintiff was made aware by P.O Jimenez and P.O. Ovalle that another officer P.O. Puente, was telling other officers in the department to stay away from Plaintiff, not to trust her, and not to allow her in their vehicles because she is a troublemaker. Considering the line of duty for a police officer, advising other officers to stay away from her or not to trust her is potentially dangerous in the event Plaintiff requires assistance from other officers or back-up during an automobile stop or similar incident.

114.    On November 11, 2020, Plaintiff was assigned to the 7th Street precinct. Plaintiff was doing reports in the precinct when Lt. Ocasio came into the precinct and stood directly behind Plaintiff while he was speaking with another officer for approximately twenty (20) minutes. This made Plaintiff increasingly uncomfortable.

115.    On November 19, 2020 P.O. Jose Diaz called Plaintiff asking if she got into an argument with Sgt. Armas. P.O. Diaz advised Plaintiff that he has heard that other supervisors were told to write Plaintiff up if she was out of uniform, without a hat, or if she was sitting in her patrol car. P.O. Diaz also advised Plaintiff that there were rumors he has heard regarding Plaintiff and P.O. Aviles.

116.    On or about February 12, 2020 Plaintiff received a group text message from an unknown telephone number, which included other numbers belonging to officers from the same department, the Mayor of Union City, Brian Stack, and other numbers which were unknown to Plaintiff.

117.    The message contained multiple pictures with captions, or "memes," which were specifically depicting the Union City Police Chief, Plaintiff, and the Union City Mayor.

118.    One of the memes in the group message, read "Brian Stack protects his minions, corruption, sexual harassment hostile work environment at Union City Police" with photos of Plaintiff, Sgt. Armas, Brian Stack and Chief Luster.

119.    At the bottom of the meme and under their pictures it read, "Help Officer Samantha Martinez call the FBI." Another meme with Plaintiff's picture had "Victim" written across the picture.

120.    Another photo with Plaintiff and Brian Stack's face, read "Brian Stack laughs as Officer Samantha Martinez is being sexually harassed and bullied by his supporters in the Union City Police Department."

121.    On February 12, 2021 Plaintiff reported to Lt. DeRojas that she was reporting the message as he was also a recipient of the message.

122.    Plaintiff spoke to Sgt. Chasmer about the incident, her squad supervisor. Sgt. Chasmer submitted a PD-11 explaining the messages that Plaintiff showed him. Sgt. Chasmer was able to identify that the other numbers included in the group message belonged to Lt. Matulewicz, Retired Sgt. J. Ruiz, Det. Blackburn, and Retired Sgt. J. Rodriguez. The sender of the message and two other numbers in the group message remained unknown to Sgt. Chasmer.

123.    On March 18, 2021, Plaintiff rode back to headquarters with another officer after docking the ESU vehicle. Upon returning to headquarters, P.O. Ascencio advised Plaintiff that the "word on the street" was to stay away from her.

124.    On April 13, 2021 P.O. Diaz called Plaintiff to let her know that Sgt. Lugo tried submitting an application for FOP enrollment and Lt. Gaston refused the application stating, "Absolutely not, she is a rat. She wants to go after supervisors and file complaints against them."

125.     P.O. Diaz also advised Plaintiff that Lt. Gaston discussed not allowing Plaintiff into the FOP with other board members and they allegedly agreed.

126.     Despite Plaintiff's continued complaints to supervisors in the Union City Police Department, the Police Chief of the Union City Police Department, and Internal Affairs, and despite the Union City Police Department's knowledge of the harassment, the hostile conduct continued without abatement.

127.     Therefore, Plaintiff has continued to suffer a continuously hostile work environment, which has significantly affected her health and ability to work, causing Plaintiff serious stress and forcing her to take days off from work.

## COUNT I - SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE NEW JERSEY LAW AGAINST DISCRIMINATION

128.     Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

129.     By the conduct set forth in the Statement of Facts above, Defendants created a sexually hostile work environment for Plaintiff in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et. seq.* as follows. Defendants subjected Plaintiff to unwelcome conduct of a sexual nature that was severe and pervasive.

130.     Moreover, Lieutenant Matulewicz made specific comments throughout the Department on multiple occasions concerning Plaintiff's personal relationships, alleging and/or insinuating that Plaintiff was having sex with her direct Lieutenant in return for favorable treatment at work, and that Plaintiff having sex with at least three fellow officers. Defendant's conduct caused adverse responses from other officers within the department, including but not

limited to, not responding to Plaintiff's request for a supervisor during her shift. But for

Plaintiff's gender, this conduct would not have occurred, and such conduct was pervasive

enough to make any similarly positioned female officer believe her conditions of employment

were altered and the environment was hostile and/or abusive.

131.    The discrimination detrimentally affected Plaintiff.

132.    Plaintiff suffered tangible employment actions as alleged herein.

133.    The discrimination would detrimentally affect a reasonable woman in Plaintiff's

position.

134.    Defendants knew, or reasonably should have known of the sexual harassment.

135.    Defendants failed to exercise reasonable care to prevent and promptly correct the

harassing behavior.

136.    As a result of Defendants' conduct as aforementioned, Plaintiff has suffered

damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of

this Complaint, *infra*.

### COUNT II – GENDER DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AND THE NEW JERSEY LAW AGAINST DISCRIMINATION

137.    Plaintiff incorporates the preceding paragraphs as if set forth more fully at length

herein.

138.    By the conduct set forth in the Statement of Facts above, Defendants engaged in

unlawful employment discrimination against Plaintiff on account of her gender in violation of

the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et. Seq.* as follows. Defendants

treated male employees more favorably than Plaintiff.

139.     Male officers with the same title of Emergency Services Unit ("ESU") as Plaintiff and less department service in ESU than Plaintiff were assigned to the ESU tactical truck, despite Plaintiff's position of seniority over male ESU officers and her qualification to be assigned to the ESU tactical truck during her shifts.

140.     Moreover, Lt. Matulewicz created a pervasive atmosphere of gender discrimination through his actions and words, creating a hostile environment. It is heavily documented and well-known, with Defendant's supervisory officers, Defendant's Internal Affairs and Plaintiff's Police Benevolent Association, that Lt. Matulewicz discriminated against women. It is also well-known that Lt. Matulewicz maintains a close relationship with the Union City Mayor, Brian Stack, and many of the complaints against Lt. Matulewicz are not reported in fear of adverse action or retaliation.

### COUNT III – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE NEW JERSEY LAW AGAINST DISCRIMINATION

141.     Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

142.     By the conduct set forth in the Statement of Facts above, Defendants engaged in unlawful retaliation against Plaintiff for submitting her PD-11 report to Defendant Union City Police Department Chief of Police and Internal Affairs, alleging specific adverse conduct by Plaintiff's direct supervisors and Defendants herein, resulting in Plaintiff's wrongful write-ups and failure to be assigned to ESU.

143.     There exists a causal connection between Plaintiff's participation in the protected activity and the adverse employment action.

144.     As a direct and proximate result of the extreme, outrageous, malicious, willful and reckless conduct of the Defendants, Plaintiff has suffered emotional pain, distress and anguish.

**COMPENSATORY DAMAGES AND RELIEF REQUESTED**

145.     Plaintiff incorporates the preceding paragraphs as if set forth more fully at length herein.

146.     The effect of Defendants' unlawful gender discrimination, harassment and retaliatory practices deprived Plaintiff of equal employment opportunities and otherwise adversely affected her life, status and promotional opportunities as an employee of Defendants.

147.     As a direct result of Defendants' willful, wrongful, and unlawful acts in discriminating against Plaintiff on the basis of her gender and in retaliation and harassing her, Plaintiff has suffered severe emotional distress, depression, humiliation, embarrassment, and impaired self-esteem.

148.     All of Defendants' unlawful acts committed against Plaintiff (that is, all harm inflicted on Plaintiff through malice rather than through negligence) were intentional, hostile, egregious, extreme, and outrageous, and were committed with malicious, willful and/or reckless indifference to Plaintiff's rights under federal and state law.

149.     As a direct and proximate result of the extreme, outrageous, intentional, hostile, malicious, willful, and reckless conduct of Defendants, Plaintiff has suffered severe emotional pain, distress, and anguish.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the court grant the following relief:

A.      Order Defendants to compensate Plaintiff for her damages in an amount to be proven at trial, and that such relief entail all forms, legal or equitable, recoverable under Title VII and under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et. seq.* including, but not limited to: , emotional distress, pain and suffering, and humiliation, attorneys' fees, expert witness fees, if applicable, and the costs of bringing this action, together with any applicable pre- and post-judgment interest.

B.      Order Defendants to compensate Plaintiff for punitive damages.

C.      Order Defendants to compensate Plaintiff for unliquidated damages.

D.      An allowance to compensate for negative tax consequences.

E.      A permanent injunction enjoining Defendants, its directors, officers, employees, agents, successors, heirs and assigns, and all persons in active concert or participation with it, from engaging in, ratifying, or refusing to correct, employment practices which discriminate in violation of the Title VII and the NJLAD.

F.      Order Defendants to institute and implement, and for its employees and officers to attend, and/or otherwise participate in, training programs, policies, practices and programs which provide equal employment opportunities.

G.      Order Defendants to remove and expunge, or to cause to be removed and expunged, all negative, discriminatory, and/or defamatory memoranda and documentation from Plaintiff's record of employment, including but not limited to, to pre-textual reasons cited for its adverse actions and disciplines.

      H.      Award extraordinary, equitable and /or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure.

      I.      Any other such relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests trial by jury on all Counts as permitted by law.

Respectfully submitted,
Herbert & Weiss, LLP

*Helene C. Herbert*

Helene C. Herbert, Esq.                        Date: May 26, 2022
Attorneys for Plaintiff
162 Engle Street
Englewood, New Jersey 07631
201-440-6300