<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SAMANTHA MARTINEZ, | Civil Action No. 21-11111 (SDW) (AME) |
| Plaintiff, | |
| v. | **OPINION** |
| CITY OF UNION CITY, LIEUTENANT MATULEWICZ, JOHN DOE 1-10, JANE DOE 1-10, | September 24, 2025 |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are Defendants the City of Union City and Lieutenant Matulewicz's ("Defendants") Motions for Summary Judgment (D.E. 117 & 120)[1] pursuant to Federal Rule of Civil Procedure ("Rule") 56.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1367(a).  Venue is proper pursuant to 28 U.S.C. § 1391(b).  For the reasons stated herein, the Motions are **GRANTED.**

I.    <u>**FACTS**[2]</u>

---

[1] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein.

[2] Consistent with Rule 56(c), this Court considers the parties' Statement of Material Facts ("SOMF") and any responses thereto, as well as the depositions and documents in the record.  Where a SOMF cites to the record, this Court cites to the same.  Additionally, where a party failed to counter a material fact in accordance with Local Rule 56.1's requirements, this Court deems that fact as undisputed for purposes of the Motions.

Plaintiff Samantha Martinez ("Plaintiff" or "Martinez") began working in the Union City Police Department's ("the Department" or "UCPD") Patrol Division in January 2013. (D.E. 125-2, Pl. Ex. A, Martinez Dep. 20:11–17, 22:14–19.) Around November or December 2018, Plaintiff requested a transfer to the Department's "Powershift," which meant her work hours changed to 7:00 p.m. to 3:00 a.m. (*Id.* at 25:20–24, 33:21–24, 34:22–25.) Plaintiff is also a member of the Department's Emergency Service Unit ("ESU"). (*Id.* at 41:11–15.) The facts underlying this litigation allegedly occurred during Plaintiff's tenure with the Department and span from February 2020 to June 2021. Notably, the Department still employs Plaintiff and promoted her to sergeant in 2022. (Martinez Dep. 40:6–15.) For the sake of clarity, this Court sets forth the facts for each of the twenty-five incidents Plaintiff sets forth in her Second Amended Complaint.

### A. Incident One

Plaintiff claims that on February 29, 2020, while at the police desk inside the Department's headquarters, Defendant Lieutenant Matulewicz ("Matulewicz") commented to Plaintiff, "Your boyfriend's not here today." (Martinez Dep. 54:10–16, 55:16–56:1, 60:20–61:2; D.E. 119-1, Union City Ex. B at 88.) Plaintiff took this to insinuate that she was "having relations with [her] direct/immediate supervisor," Lieutenant DeRojas, who also happened to be absent that day. (Union City Ex. B at 88; Martinez Dep. 55:22.) "What?" Plaintiff responded. (Union City Ex. B at 88.) Plaintiff claims that in response, Matulewicz repeated the comment. (*Id.*) However, Matulewicz denies making the statements or that Plaintiff told him "she was not his boyfriend." (D.E. 119-1, Union City Ex. E, Matulewicz Dep. 114:20–115:9.)

Further, according to Plaintiff's version of events, she stormed out of headquarters and spoke with Officers Bido and Portillo, who advised her to document the incident. (Martinez Dep. 59:17–60:3.) Plaintiff also stated she called Lieutenant DeRojas. (*Id.* at 65:8–16.) Plaintiff did

not officially report the incident in the days that followed and claims she "probably just wrote it down, like on my Note or on my calendar."[3]  (*Id.* at 65:21–25.)  This incident is described in the PD-11 Plaintiff filed with Union City Police Chief Nichelle Luster on July 2, 2020.  (Union City Ex. B at 88.)  Plaintiff claims other people were present at the police desk but does not quantify or identify those people.

### B.  Incident Two

Plaintiff claims that while at the police desk area, Matulewicz "made more sexual allegations" implicating her and Lieutenant DeRojas, specifically stating:  "I hope she's doing you real good" and "I hope she's sucking you real good."  (Union City Ex. B at 88; Martinez Dep. 66:7–67:1.)  According to Plaintiff, Lieutenant DeRojas verbally told her about these statements, as Matulewicz made the statements in front of him, Captain Botti, and Lieutenant Gaston.  (Martinez Dep. 67:4–68:16.)  Lieutenant DeRojas denied that Matulewicz made this comment to him.  (D.E. 119-1, Union City Ex. F at 222.)  Similarly, Matulewicz denied making either comment.  (Matulewicz Dep. 115:21–116:3.)

Regarding reporting and documentation, Plaintiff claims she told Officers Ron and Randy Portillo about this incident.  (Martinez Dep. 70:15–18.)  Lastly, she did report this incident in her July 2, 2020 PD-11 to Chief Luster.  (Union City Ex. B at 88.)  In the PD-11, she claims multiple co-workers came to her to tell her about the statements as well.  (*Id.*)

### C.  Incident Three

In her July 2, 2020 PD-11, Plaintiff documents an incident in which Lieutenant Matulewicz allegedly spread "rumors about [Police Officer] A. Aviles and [her] having sexual relations," and

---

[3] Plaintiff's Exhibit E, P0087 purports to be Plaintiff's personal note.   The note indicates that on June 25, 2020, Plaintiff "spoke to Botti about 1:45am about Lester [sic] report and Stevie harassment."

stated, "Samantha is downtown, so I can't put [Aviles] next to her," when deciding what post to assign to Officer Aviles.  (Union City Ex. B at 89; Martinez Dep. 79:14–19, 83:22–84:5.)  Plaintiff was not present when the statements were made; she claims multiple co-workers approached her to tell her about the rumors but failed to identify specific co-workers when asked because "[t]here [were] so many."  (Martinez Dep. 79:20–80:3.)  Yet, Lieutenant Matulewicz denies making such statements or that he specifically did not assign Officer Aviles to work with Plaintiff.  (Matulewicz Dep. 116:7–14, 119:14–17.)

### D.  Incident Four

In her July 2, 2020 PD-11 Plaintiff alleges that Officer Ovalle told her that when Matulewicz holds his lineups/rollcalls "he speaks in a very perverted manner."  (Union City Ex. B at 89; Martinez Dep. 98:17–25.)  As an example, Officer Ovalle told Plaintiff "that Lieutenant Matulewicz would make comments about juices and stuff like that," which Officer Ovalle understood to refer to "sexual juices."  (Martinez Dep. 100:1–9.)  Admittedly, Plaintiff was never present for one of these lineups/rollcalls.  (*Id.* at 99:1–3, 16–22.)

### E.  Incident Five

Incident Five, also reported in the July 2, 2020 PD-11, consists of two sets of comments made about Plaintiff's role as an ESU officer.  According to Plaintiff, it is "common practice" in the Department for "the most senior ESU officer be assigned to the ESU truck."  (*Id.* at 92:9–13, 94:3–13.)  Notwithstanding, Plaintiff claims that one night, when she was working the Night Tour, which was supervised by Matulewicz, someone suggested she be assigned to the ESU truck to which Matulewicz responded:  "She will never be on that truck and be ESU."  (Union City Ex. B at 89; Martinez Dep. 86:7–18, 89:6–24.)  Plaintiff claims Lieutenant DeRojas verbally told her about this comment; she was not present when it was made.  (Martinez Dep. 86:19–87:2.)

Additionally, by Plaintiff's own admission, another officer—Officer Nicanor "Nick" Jimenez—is also an ESU member that was not assigned to the ESU truck "even when he is the senior officer working the tour." (Union City Ex. B at 89; Martinez Dep. 95:7–24.)

Plaintiff also believes Matulewicz made a comment about her being a "fake ESU" and that "[she] just wear[s] the uniform." (Union City Ex. B at 88; Martinez Dep. 72:24–73:2.) She did not personally hear or witness the statement being made; it was reported to her by Officer Taveras, whom Plaintiff believes was present. (*Id.* at 73:3–74:5.) When asked whether she believed whether statements above were made because she is a female, Plaintiff responded: "It's possible." (*Id.* at 78:11–79:7, 98:14–16.)

Matulewicz denied making either statement or stating "that [Plaintiff's] just getting to wear the ESU uniform." (Matulewicz Dep. 116:15–119:13, 123:14–17.)

### F.  Incident Six

On March 19, 2020, given the risks associated with COVID-19, Police Chief Luster adopted Special Order No. 2020-007, which required that either a supervisor or police officer man the communications/dispatch desk to determine whether incoming calls to file a report could be handled telephonically. (D.E. 119-1, Union City Ex. G.) Certain types of reports were specifically to be handled telephonically, as opposed to dispatching officers. (*Id.*) If the call could be addressed telephonically, the supervisor or officer was to obtain the caller's name, phone number, and email address. (*Id.*) Plaintiff alleges that she was purposely dispatched to respond to two calls that could have been addressed telephonically, in violation of Special Order No. 2020-007. (Union City Ex. B at 90; D.E. 71 ("Second Amended Complaint" or "SAC") ¶¶ 38–40.)

*1.  Call One*

At approximately 8:06 p.m., Detective Diaz called Officer DelRio, who was handling the communications/dispatch desk, to request that a unit be sent to a particular address regarding a threat. (D.E. 119-1, Ex. H at 230.) After confirming this call did not involve a threat previously reported, Officer DelRio asked the detective whether he had the caller's phone number, to which the detective responded: "No I didn't get her phone number, [d]amn it!" (*Id.*)

Plaintiff was dispatched and while *en route*, called Matulewicz, who was the Desk Supervisor on that shift. (*Id.* at 231.) Given that the call received only sought to report a threat, Plaintiff asked Matulewicz whether she should really be responding to the call in light of the latest policy. (*Id.*) Matulewicz instructed Plaintiff to hold off on reporting to the location until she got further information from the dispatcher and explained he would see if Officer Puente could redirect the report. (*Id.*) Then, Matulewicz called Officer Puente twice, at 8:17 p.m. and 8:24 p.m., respectively, seeking clarification and alerting Officer Puente as to the issue. (*Id.* at 231–33.) During the second call, Matulewicz acknowledged that the Department was "trying to keep [its] officers from getting exposed." (*Id.* at 233.)

According to a PD-11 form Plaintiff submitted to Lieutenant Matulewicz that night following the first call, "[a]s [she] awaited further instruction," the dispatchers instructed her to continue the response to the call, which she and another officer ultimately did. (D.E. 119-1, Union City Ex. I at 236.)[4]

### 2. Second Call

At approximately 10:50 p.m., Officer Bido called Matulewicz to inquire as to what calls were "report only" calls and expressed concern because Plaintiff had just been "sent on her second belated report." (Union City Ex. H at 233.) After being apprised of this, Matulewicz instructed

---

[4] Plaintiff only filed that PD-11 with Lieutenant Matulewicz; she did not file it with Chief Luster. (Union City Ex. B at 90.)

the officer at the communications desk to "cancel the unit" before Plaintiff could get to the second call's location. (*Id.* at 234.) Ultimately, Matulewicz reprimanded Officer Puente, who was manning the calls, but did not discipline Plaintiff. (*Id.* at 214; Martinez Dep. 127:22–128:4.)

As she did following the first call, Plaintiff drafted another PD-11 in which she expressed concern over the handling of the calls, particularly given how "alarming" "the fear of contracting COVID-19 and or its symptoms" was for most officers who sought to continue carrying out their duties. (D.E. 119-1, Union City Ex. J.) As with the PD-11 concerning the first call, Plaintiff did not submit this PD-11 to Chief Luster. (Union City Ex. B at 90.)

### G. Incident Seven[5]

On or approximately around April 24, 2020, Matulewicz "had officers report to police headquarters regarding keys belonging to the police vehicles." (Union City Ex. B at 89.) Plaintiff cannot specifically recall what the issue with the keys was. (Martinez Dep. 105:7–10.) However, Plaintiff alleges that she was the only patrolman and Powershift patrolman called back to the desk multiple times. (Union City Ex. B at 89.) According to Plaintiff, she remembers Lieutenant DeRojas was in that day and should have addressed the issue, but she was called in via radio by Matulewicz instead. (Martinez Dep. 103:15–105:6.) Plaintiff believes this was done "to continue targeting [her]," but could not indicate how she was being targeted or why she was being targeted. (*Id.* at 112:16–113:18.) Plaintiff claims that on the same day, another patrolman told her Matulewicz "was speaking badly of [her] at the desk area." (Union City Ex. B at 90.)

### H. Incident Eight

Plaintiff's July 2, 2020 PD-11 form reports that in June 2020, Plaintiff stopped a DPW waste truck that was spilling fluids and requested a supervisor's presence on the scene. (Union

---

[5] Plaintiff included this incident in her July 2, 2020 PD-11 form. (Union City Ex. B at 89–90.)

City Ex. B at 90.)  Sergeant Hernandez called Plaintiff's cellphone and told her to "standby for further guidance." (D.E. 119-1, Union City Ex. L at 249.)  "Shortly after, [Lieutenant] DeRojas contacted [Plaintiff] with instructions on the matter." (Union City Ex. B at 90.)  DeRojas told Hernandez he would take care of the issue. (D.E. 119-1, Union City Ex. K, Hernandez Dep. 53:14–25.)

After the issue was resolved, Plaintiff wrote up an incident report and mentioned "requesting a supervisor and him not arriving," referring to Sergeant Hernandez. (Union City Ex. B at 90; D.E. 119-1, Union City Ex. N at 269.)  DeRojas initially approved Plaintiff's report. (Union City Ex. N at 271.)  Hernandez saw the report's contents and spoke with DeRojas, who stated he would change the statement about Hernandez not going to the scene. (Union City Ex. B at 90–91; D.E. 119-1, Union City Ex. M at 256.)  DeRojas then utilized Lieutenant Ocasio's login credentials to change Plaintiff's report. (Union City Ex. M at 254.)  DeRojas showed Plaintiff the change and she indicated she wanted the report left as previously written, which led to DeRojas changing it back. (Union City Ex. M at 259; Ex. N at 269–70.)  Sergeant Hernandez then rejected the report. (Union City Ex. N at 269.)  Following an Internal Affairs ("IA") investigation,[6] Plaintiff was not disciplined for this incident; Lieutenants DeRojas and Ocasio were. (Union City Ex. M at 264–66; D.E. 119-1, Union City Ex. P; D.E. 119-1, Union City Ex. O, Ocasio Dep. 20:21–25.)

---

[6] On June 25, 2020, Plaintiff spoke with Captain Botti about the DPW Incident and during the course of that conversation, she expressed that she felt she was the target of harassment perpetuated by Matulewicz. (D.E. 119-1, Union City Ex. F at 195.)  Captain Botti then spoke with Inspector Wolpert, who advised Botti to submit a PD-11 and instructed Matulewicz and Hernandez not to have contact with Plaintiff.  (*Id.*)  Captain Botti's June 25, 2020 PD-11 form reports he instructed Matulewicz and Sergeant Hernandez that "any interactions with P[O] Martinez should go through her direct supervisor and in his absence," with Captain Botti.  (D.E. 119-1, Union City Ex. Q at 291.)

Notably, after IA launched its investigation into Plaintiff's claims, Chief Luster reassigned Matulewicz to the Communication Days – Detail so he and Plaintiff would not interact during the pendency of the investigation.  (D.E. 119-1, Union City Ex. R; Union City Ex. F at 224; D.E. 119 ("Union City SOMF") ¶¶ 119–20; D.E. 125-1 at 8.)

### I.  Incident Nine

As reported in her July 2, 2020 PD-11 form, Plaintiff stated that Officers Paz and Lisandro Garcia told her they were questioned about her work patterns.  (Union City Ex. B at 91; Martinez Dep. 173:10–174:19.)  Plaintiff maintains that Matulewicz and Sergeant Hernandez were doing this "to target [her] to get disciplined or in some sort of trouble."  (Martinez Dep. 175:13–15.)

### J.  Incident Ten

On July 20, 2020, Plaintiff was assigned to a walking post when a high-priority call came over the radio.  (Martinez Dep. 227:18–20.)  Officer Taveras picked Plaintiff up and both responded to the call.  (*Id.* at 227:20–21.)  At the scene, Sergeant Hernandez reprimanded Plaintiff for leaving her post to respond to the call.  (*Id.* at 231:1–16.)  Plaintiff claims she was the only female ESU member reprimanded but does not recall whether there were other female or Powershift officers at the scene.  (SAC ¶ 60; Martinez Dep. 231:17–24.)

Plaintiff reported this incident to Lieutenant Omar Hernandez.  (Martinez Dep. 236:11–12.)  On July 23, 2020 at 2:38 p.m., Lieutenant Sierra sent an email with "PO Sam Martinez" as the subject line instructing sergeants that Plaintiff could respond to a "high priority" call or "something that ESU needs to get involved with . . . no matter her assignment at the time[] if she is available."  (D.E. 119-1, Union City Ex. X at 584.)  IA did not investigate Plaintiff for, nor was there a mark made in her record—that she knows of—because of this incident.  (Martinez Dep. 232:3–8.)

### K.  Incident Eleven

On August 15, 2020, Lieutenant Ocasio was on the road when he saw an ESU truck.  (D.E. 119-1, Union City Ex. Y at 588.)  Ocasio stated he was unaware whether it was Martinez using the truck, but that he called the desk sergeant on duty and asked who was using the truck and

whether it was on a detail.  (*Id.*)  Ocasio reported that Desk Sergeant Ian Nunez told him Plaintiff

had the truck and that "he had called her and she was supposed to come in and she didn't come

in."  (*Id.*)  Ocasio suggested to Desk Sergeant Nunez that Sergeant Armas, who was on the road,

investigate.  (*Id.* at 588–89.)  Sergeant Armas found Plaintiff, along with Officer Aviles, talking

by the truck.  (*Id.* at 589.)

According to Sergeant Nunez, by failing to return the truck by the end of her shift at 3:00

a.m., Plaintiff violated Captain Botti's orders.  (*Id.* at 591.)  In her PD-11 related to this incident,

Plaintiff admitted to previously staying past her scheduled tour without being reprimanded.  (D.E.

119-2, Union City Ex. AA.)  IA investigated the matter and ultimately Sergeant Nunez and

Lieutenant Ocasio received oral reprimands.  (D.E. 119-1, Union City Ex. Y at 593.)  Plaintiff was

not disciplined; instead, she was advised on proper procedures.  (*Id.*)

### L.  Incidents Twelve & Thirteen

On two separate occasions Officer Portillo informed Plaintiff that there was writing on one

of the men's bathroom stalls.  (D.E. 119-1, Ex. D, Martinez Dep. II 9:11–10:14, 30:10–31:3.)

Plaintiff received a picture of the first writing, which read "Sam is a rat," on September 14, 2020.

(*Id.* at 13:12–24, 179:18–180:11.)  Similarly, she received a picture of the second writing, stating

"Sam records cops," on October 6, 2020.  (*Id.* at 180:20–23.)  Plaintiff does not know who wrote

either message.  (*Id.* at 11:12–14, 32:1–3.)

After each incident, Plaintiff reported the writings to IA.  (D.E. 119-1, Union City Ex. F at

211, 213.)  Both times Lieutenant Bergbauer attempted to further investigate but found either

Plaintiff's name or the entire message blacked out.  (*Id.* at 213.)  In her deposition, Plaintiff claimed

Officer Portillo blocked out the writing "out of his own heart" given the humiliating nature of the

messages.  (*Id.* at 14:8–24.)

On October 6, 2020, a Department-wide Memorandum was sent out concerning the writing on the bathroom walls and advising of the potential discipline and corresponding criminal charges that would result if caught.  (D.E. 119-2, Union City Ex. CC.)  On October 7, 2020, Chief Luster also sent a Department-wide email reminding personnel that harassment was unacceptable.  (D.E. 119-2, Union City Ex. DD.)

### M. Incident Fourteen

On September 24, 2020, Inspector Wolpert requested that Matulewicz "check[] on the Detail Officers at their perspective [sic] assignments."  (*See* D.E. 119-2, Union City Ex. BB at 4.)  Matulewicz checked on eight different detail locations—including one where Plaintiff and Sergeant Goodwin were posted.  (*Id.* at 4–5.)  That same day, Plaintiff requested a meeting with IA where she expressed that she was uncomfortable with Matulewicz checking on her detail because he had been instructed to stay away from her.[7]  (D.E. 119-1, Union City Ex. F at 211.)

### N. Incident Fifteen

On November 4, 2020, Lieutenant Ocasio advised Sergeant Delatorre to reach out to Plaintiff "because she had been the only [Powershift] officer to not check[] in at the desk."  (D.E. 119-2, Union City Ex. EE at 27.)  Sergeant Delatorre called for Plaintiff over the radio; in response, Plaintiff advised of her location.  (Martinez Dep. II 47:13–48:9.)

At this point, Plaintiff had docked her police vehicle at a police garage.  (Martinez Dep. II 43:14–25, 45:12–46:1.)  Plaintiff asked Officer Ascencio to give her a ride back to police headquarters in his personal vehicle.  (*Id.* at 44:1–6, 47:6–8.)  By policy, officers are prohibited from using personal vehicles while on duty.  (*See* Union City Ex. EE at 28.)

---

[7] As discussed above, following the DPW Incident, Captain Botti instructed Matulewicz to go through Plaintiff's direct supervisor or himself.  *See supra* at 8 n.6.

Sergeant Armas was on his way back to headquarters when he saw a blue Jeep and "heard a distinctive chirp emanate from inside the vehicle," which "raised his suspicion that [Plaintiff] was inside the blue Jeep." (Union City Ex. EE at 12.) He decided to follow the Jeep, and once at headquarters asked the desk clerk, Officer Saroli, to run the Jeep's license plate. (*Id.*)

After arriving at headquarters, Officer Erazo advised Plaintiff of Armas's request. (Martinez Dep. II 50:16–51:5.) Plaintiff then asked to speak with Lieutenant Mordan—who had authorized Sergeant Armas to investigate whether Plaintiff was in the vehicle—and Sergeant Armas and the parties spoke about what had just occurred. (Union City Ex. EE at 27–28.) Lieutenant Mordan instructed both Plaintiff and Armas to submit PD-11's. (*Id.* at 28.)

Once Plaintiff notified IA of this incident, Chief Luster ordered IA to "commence an investigation immediately." (Union City Ex. EE at 11.) The IA investigation "did not reveal any nexus to Officer Martinez's claim that she [was] being harassed by Lieutenant Matulewicz or that she was being targeted for filing an EEOC complaint." (*Id.* at 51.) IA also found "no recorded history between Martinez & Armas" or any evidence "to suggest Armas' actions . . . were retaliatory." (*Id.*) Ultimately, IA recommended departmental charges against Sergeant Armas which resulted in a twenty-five-day suspension for him. (*Id.* at 52.)

### O. Incident Sixteen

Plaintiff heard from Officer Diaz that Lieutenant Gaston was "going around the Department calling Plaintiff a 'troublemaker.'" (Martinez Dep. II 75:1–15, 76:18–25.) Plaintiff believes Sergeant Lugo told Officer Diaz. (*Id.* at 77:13–22.)

### P. Incident Seventeen

Lieutenant Gaston's son, Officer Gaston, told Plaintiff people were telling him to stay away and not trust Plaintiff. (Martinez Dep. II 83:2–23.) Officer Gaston did not tell Plaintiff who these

individuals were, nor did Plaintiff personally hear such statements being made. (*Id.* at 83:24–84:23.)

### Q.  Incident Eighteen

Officers Jimenez and Ovalle told Plaintiff that Officer Puente had advised them to stay away from and not trust Plaintiff. (Martinez Dep. II 87:9–88:25.)

### R.  Incident Nineteen

Plaintiff claims that while working on reports during the Powershift at the 7th Street Precinct, "Lieutenant Ocasio came into the precinct and stood directly behind [her] while he was speaking with another officer for approximately 20 minutes." (Martinez Dep. II 91:13–19.) This made Plaintiff feel "increasingly uncomfortable." (*Id.* at 91:23–25.)

### S.  Incident Twenty

On November 19, 2020, Officer Diaz called Plaintiff and told her he had heard "that the other supervisors were told to write [P]laintiff up if she was out of uniform without a hat or if she was sitting in a patrol car." (Martinez Dep. II 103:13–104:9.)

### T.  Incident Twenty-One

On February 12, 2021, Plaintiff—along with ten other recipients[8]—received a mass text message with various images. (Union City SOMF ¶ 208.) Two of the images sent contain Plaintiff's picture. (Union City SOMF ¶ 211.) One image states: "Brian Stack protects his minions corruption, sexual harassment hostile work environment at Union City Police" and contains pictures of the following individuals: Plaintiff—with the word "victim" overlayed—Matulewicz, Sergeant Armas, Chief Luster, and Union City Mayor Brian Stack. (D.E. 119-2, Union City Ex. GG at 62.) The other image contains Plaintiff's and Mayor Stack's pictures and

---

[8] Plaintiff's phone populated the names of four of the ten other recipients. (Union City SOMF ¶ 209.)

states: "Brian Stack laughs as Officer Samantha Martinez is being sexually harassed and bullied by his supporters in the Union City Police Dept. They must be brought to justice and arrested." (*Id.* at 63.)

That same day, Plaintiff approached Sergeant Chasmer about the text messages. (D.E. 119-2, Union City Ex. HH.) In his PD-11 filed with Lieutenant Bergbauer, Sergeant Chasmer identified the phone number that broadcast the series of messages followed by "(unknown)." (*Id.*)

### U. Incident Twenty-Two

On March 18, 2021, Officer Ascencio told Plaintiff that "the 'word on the street' was to stay away from her." (*Id.* at 122:20–123:5.) Ascencio did not identify who told him this. (*Id.* at 123:13–15.)

### V. Incident Twenty-Three

Plaintiff claims that on April 13, 2021, Officer Diaz called her to tell her Sergeant Lugo tried submitting her Fraternal Order of Police ("FOP") enrollment application,[9] but Lieutenant Gaston—the FOP's president at the time—refused it and said, "[A]bsolutely not. Sam is a rat." (Martinez Dep. II 128:2–9.) Plaintiff did not hear Lieutenant Gaston say this nor does she know how Sergeant Lugo heard what Lieutenant Gaston said. (*Id.* at 131:7–22.)

On August 25, 2020, Plaintiff texted Sergeant Lugo[10] to inquire on the status of her FOP application. (D.E. 119-2, Ex. JJ at 90.) Sergeant Lugo told Plaintiff that the FOP would need to first "have a meeting and make nominations then have the vote." (*Id.*) Yet according to Lieutenant Gaston, because of COVID-19, "everything was put on hold from the state," which led to the FOP

---

[9] Non-supervisors can enroll in the FOP to receive better legal protection than that offered by the Police Benevolent Association ("PBA"). (Martinez Dep. II 127:1–11.)

[10] At the time, Sergeant Lugo was the FOP's recording secretary. (Union City SOMF ¶ 230; Pltf. SOMF at 14.)

not having any meetings "for close to a year." (D.E. 119-2, Union City Ex. II, Lt. Gaston Dep. 24:5–25:14.) Once FOP meetings and elections started up again, Plaintiff reached out to Sergeant Dunlay, the FOP's new recording secretary. (*Id.* at 26:9–27:2; Union City Ex. JJ at 91.) It is unclear when Plaintiff's FOP application was processed and accepted. Notwithstanding, Plaintiff successfully enrolled in the FOP. (Martinez Dep. 147:3–17.)

### W. Incident Twenty-Four

On May 21, 2021, Plaintiff advised Communications that she was checking on a male individual and provided the address. (D.E. 119-2, Union City Ex. KK at 94.) At 9:08 p.m. Plaintiff called for backup, prior to exiting her police vehicle. (Union City Ex. LL at 105–06.) As Plaintiff gave a play-by-play update she described how the male individual began to walk away. (*Id.*)

At 9:09:28 p.m., one officer indicated he could "start heading that way if you need me to." (Union City Ex. LL at 106.) At 9:11:13 p.m. the Communications desk requested backup; at 9:11:22 p.m., Sergeant Palacios stated: "Copy responding." (*Id.*) At 9:11:43 p.m. the Communications desk officer radioed to Plaintiff: "I have Sec 7 and Car 7 responding to you." (*Id.* at 107.) Plaintiff claims she heard someone say "that's not important" over the radio, in reference to her request. (Union City Ex. KK at 94.) However, the officer at the Communications desk said this at approximately 9:10 p.m. and in response to another officer saying he was at an apartment lockout, not about Plaintiff's call for help. (Union City Ex. LL at 106.) Officers arrived on the scene at 9:12:42 p.m. and 9:13:47 p.m., respectively. (*Id.*)

Plaintiff claims she called for backup while conducting a stop and that officers purposely failed to respond. (Union City Ex. KK at 95.) IA's investigation of this incident revealed that Lieutenant Ocasio was near to Plaintiff, but he only responded at 9:12 p.m. because he had been looking down at his phone, entering overtime. (*See id.* at 106–07, 120–21.) Lieutenant Ocasio

was disciplined and received a one-day suspension following the investigation.  (Ocasio Dep. 32:2–5; D.E. 119-2, Union City Ex. MM.)

### X. Incident Twenty-Five

On June 1, 2021, while Plaintiff was on a detail at a block party, Mayor Stack drove by. (D.E. 119-2, Union City Ex. NN at 132.)  Plaintiff claims that in retaliation for her filing this lawsuit, the Mayor then radioed in calling for a supervisor and stating "Police Officers have to get off their cell phones."  (*Id.* at 132–33, 137.)  Plaintiff denies being on her phone; she claims she had a water bottle in her hand.  (*Id.* at 132.)  IA looked at the security footage of this incident, which showed Officer De Fazio, who was standing next to Plaintiff, using his phone.  (*Id.* at 140.) Also, in the PD-11 filed in connection with this incident Officer De Fazio stated Plaintiff was not on her phone.  (*Id.* at 139.)  Ultimately, the case was transferred to the Hudson County Prosecutor's Office.  (*Id.* at 137.)

### II.    PROCEDURAL BACKGROUND

Plaintiff initiated the instant action on May 12, 2021, asserting claims for hostile work environment on the basis of sexual harassment, gender discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12.  (D.E. 1 ("Complaint").)  Defendants moved to dismiss Plaintiff's Complaint for failure to state a claim on June 29, 2021.  (D.E. 10 ("MTD").)

#### A. Motion to Dismiss

The Honorable Kevin McNulty, U.S.D.J., (ret.) who was initially assigned to this matter, granted in part and denied in part Defendants' MTD.  *Martinez v. City of Union City*, No. 21-11111, 2021 WL 5195708, at *11 (D.N.J. Nov. 8, 2021).  Specifically, Judge McNulty denied the City's MTD as to Plaintiff's hostile work environment and retaliation claims.  *Id.* at *6, 9.  He

dismissed Plaintiff's sex discrimination claim after concluding Plaintiff failed to show an adverse employment action.[11]  As to Defendant Matulewicz, Judge McNulty granted the MTD on the Title VII hostile work environment and the sex discrimination claims but denied it on the NJLAD hostile work environment claim.  *Id.* at *10–11.

### B. Amendments to the Complaint and Subsequent Motion

Following Judge McNulty's decision, Plaintiff filed a First Amended Complaint, (D.E. 38), and subsequently, a Second Amended Complaint ("SAC"), (D.E. 71).[12]  Plaintiff sought leave from Magistrate Judge André M. Espinosa to file a Third Amended Complaint.  Judge Espinosa denied Plaintiff's request and this Court subsequently affirmed that denial.  (D.E. 115 & 116.) Thus, the SAC is the operative complaint.[13]

On February 14, 2025, Defendants moved for summary judgment.  (D.E. 117 & 120.)  The parties timely completed briefing, and this Court held oral argument on the matter on July 2, 2025. (D.E. 153.)

### III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[11]  The MTD opinion identified two possible actions "that could potentially qualify as an adverse employment action:  Matulewicz's refusal to assign [Martinez] to the ESU truck, while assigning more junior male employees . . . and the unjustified disciplinary writeups."  *Id.* at *7.  Judge McNulty concluded that because Plaintiff failed to allege that either action led to material consequences to her employment, such as a pay cut, suspension, or a demotion, neither amounted to an adverse employment action.  *Id.*

[12]  Shortly after Plaintiff filed her Second Amended Complaint, this case was transferred to the undersigned. (D.E. 76.)

[13]  Notably, throughout Plaintiff's requests and attempts to amend the pleadings, discovery remained ongoing.  In fact, Judge Espinosa extended both fact discovery deadlines multiple times.  (D.E. 57 (extending fact discovery deadlines), 62 (same), 75 (same); *see also* D.E. 94 (holding expert discovery schedule in abeyance pending Judge Espinosa's decision on Plaintiff' request to file a Third Amended Complaint).)

56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial."  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).  Although courts view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party cannot simply rely on the "mere allegations or denials of his pleadings."  *Id.* at 288.  Similarly, "[b]are assertions, conclusory allegations, or suspicions will not suffice."  *Id.* at 288–89 (quoting *Central Dauphin*, 765 F.3d at 268–69).  If the nonmoving party fails to make an adequate showing, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

In considering a motion for summary judgment, a court can consider hearsay[14] statements only if they are capable of admission at trial.  *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000).  A court "need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial," with the proponent having to explain "the admissible form that is anticipated."  *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.2d 231, 238 (3d Cir. 2016) (citing Fed. R. Civ. P. 56).  Where the proponent seeks to admit a statement with multiple layers of hearsay, the proponent must demonstrate that each layer of hearsay would be admissible at trial.  *See Smith v. City of Allentown*, 589 F.3d 684, 693–94 (3d Cir. 2009); Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

## IV.    <u>DISCUSSION</u>

At the outset, this Court notes the parties take differing approaches in the way they frame the twenty-five incidents set out in the Second Amended Complaint.  Defendants argue that of the twenty-five incidents, the first nine are relevant to the hostile work environment claim and the remaining sixteen are pertinent to the retaliation claim.[15]  (D.E. 118 ("City Mov. Br.") at 9.) Defendants argue this Court should consider only four incidents as relevant to the hostile work environment claim and seven of the sixteen incidents relevant to the retaliation claim, as only these

---

[14] Hearsay is a statement that:  "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

[15] Lieutenant Matulewicz's brief incorporates by reference the arguments made by the City and vice versa. (D.E. 121 ("Lt. Mov. Br.") at 17 n. 1; City Mov. Br. at 21 n.2.)  Accordingly, this Court's discussion of Defendants' arguments encompasses both briefs and parses out arguments relevant to each Defendant's liability only where relevant.

are admissible, with the other fourteen incidents constituting inadmissible hearsay or being unattributable to the City.  (*Id.* at 21, 35–36.)

Plaintiff takes a different approach—arguing that all twenty-five incidents taken collectively amount to "unlawful employment practices, sexual harassment, hostile work environment, and retaliation."  (D.E. 125 at 9.)  In response to Defendants' arguments concerning the hearsay issues, Plaintiff contends that Incidents Two, Three, Four, and Five are being offered to show the effect of these statements on Plaintiff or the discriminatory and hostile nature of the work environment and not for the truth of the matter asserted.  (D.E. 125 at 20–22.)  More specifically, as to Incidents Five and Nine, Plaintiff submits that she "may present testimony from other officers who were present at the time of the comment[s]" that would corroborate Plaintiff's account.  (*Id.* at 22.)

Plaintiff's failure to substantively address Defendants' arguments as to the incidents Defendants seek to exclude on double hearsay grounds are deemed a waiver of said issue.  *See Person v. Teamsters Loc. Union 863*, No. 12-2293, 2013 WL 5676739, at *4 (D.N.J. Oct. 16, 2013) ("Where a party only defends a subset of claims in opposition to a dispositive motion, the [c]ourt will construe those claims that were not defended as abandoned."); *DeSantis v. New Jersey*, No. 04-5103, 2007 WL 1175786, at *3 (D.N.J. Apr. 19, 2007) ("[W]hen a party fails 'to offer any argument or evidence . . . in opposition to defendants' motion for summary judgment [sic], such claims may be deemed to have been abandoned.'") (second alteration in original) (quoting *Desyatnik v. Atl. Casting & Eng'g Corp.*, No. 03-5441, 2006 WL 120163, at *1 (D.N.J. Jan. 17, 2006)).

Further, even if this Court did not construe Plaintiff's failure to address the merits of Defendants' arguments as a waiver, Plaintiff's overall argument regarding hearsay and the

production and admissibility of evidence at trial is wanting.[16]  Both in her brief and at oral argument, Plaintiff's counsel alluded to potentially presenting testimony from corroborating witnesses but could not identify with any specificity what such evidence would include.  Key witnesses that are referenced throughout the record were not deposed by Plaintiff and no supporting testimony or evidence has been set forth, other than Plaintiff's self-serving assertions.  For example, witnesses, such as Sergeant DeRojas, Inspector Wolpert, and other officers were not deposed.  *See, e.g.*, OA Tr. 50:3–51:18 (Inspector Wolpert); 30:18–24 (Captain Botti); 31:14–21 (Officers Ron and Randy Portillo).  Oddly, Plaintiff's counsel stated that her decision not to depose certain individuals was a matter of choice.  (*See, e.g.*, OA Tr. 31:14–32:3, 34:15–25.)  Given the fact that discovery is—and has been—closed for some time, Plaintiff has failed to set forth any evidence that would create a genuine issue of material fact to overcome summary judgment.

In sum, not only does Plaintiff fail to substantively address Defendants' inadmissibility arguments as to a majority of the incidents in question, but she also fails to put forth any meaningful argument as to how each layer of evidence will be admissible, *Smith*, 589 F.3d at 693–94, or the "admissible form[s]" of evidence anticipated, *Fraternal Order*, 842 F.2d at 238.  As this Court noted at the conclusion of oral argument, the claims that can be proven versus the claims a party *believes* exist "are just two different things completely."  (OA Tr. 76:2–5.)  Ultimately, Plaintiff's failure to validly contest Defendants' claims as to the inadmissibility of certain incidents on double or triple hearsay grounds leads this Court to exclude Incidents Two through Five, Nine,

---

[16] Plaintiff's argument that some statements are admissible because they will be used to show the effect on the listener falls short.  For example, with Incident Two—even assuming that Plaintiff sought to introduce the statement to show its effect on her when it was relayed to her—contains an inadmissible layer of hearsay that must be surmounted in Matulewicz's statements to DeRojas.  Neither in her brief nor at oral argument did Plaintiff or Plaintiff's counsel identify how Plaintiff would admit this testimony, particularly when both DeRojas and Matulewicz denied making or hearing such statements.  (OA Tr. 48:4–49:2.)

Sixteen through Eighteen, Twenty, Twenty-Two, and Twenty-Three from its consideration and analysis, as each of these incidents would be inadmissible at trial. *See Smith*, 589 F.3d at 693–94; *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (finding the district court properly narrowed the number of allegedly discriminatory statements from twenty-one to seven where the plaintiff could not provide specifics as to the fourteen excluded statements).

### A.  Hostile Work Environment under Title VII (Count I)[17]

"Title VII prohibits sexual harassment that is 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusing working environment.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (alteration in original) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  A plaintiff asserting a hostile work environment claim must show that:  "(1) the employee suffered intentional discrimination because of his/her sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability." *Id.*  Elements one through four establish a hostile work environment and the fifth element determines employer liability. *Id.* (citing *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)).

When considering the first element, the critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (Ginsburg, J., concurring)).  The use of words with sexual content or connotations does not automatically render harassment as discrimination because

---

[17] "Because the hostile work environment analyses for Title VII claims and NJLAD claims are 'strikingly similar' [this] Court will analyze both simultaneously." *Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 576 (D.N.J. 2005) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005)).

of sex. *Id.* A plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina*[*tion*] . . . because of . . . sex." *Id.* at 81 (alterations in original).

When determining whether the workplace is saturated with discrimination sufficiently severe or pervasive to amount to a hostile or abusive working environment, courts consider the totality of the circumstances as opposed to individual incidents. *Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005). These circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," although "no single factor is required." *Harris*, 510 U.S. at 23.

Union City argues that Plaintiff has not made out a *prima facie* case of hostile work environment sexual harassment because she has failed to show that she was discriminated against or targeted because of her sex and that the conduct complained of was not severe or pervasive. (City Mov. Br. at 25–26.) Regarding the first element, Union City points out that for Incidents One, Six, Seven, and Eight, when Plaintiff complained of the conduct, it was for reasons unrelated to her sex. (*Id.* at 26–28.) Further, the City notes that for Incidents Six and Seven, other male officers were subjected to the same conduct. (*Id.* at 26–27.) Regarding the severity or pervasiveness of the conduct, Union City contends that there is no evidence of how four isolated events over a five-month period interrupted Plaintiff's ability to perform her job duties. (*Id.* at 30–31.) Defendant Matulewicz echoes the City's arguments and adds that because Plaintiff's claims against the City are "fatally flawed," it follows that the claims against him fail too. (D.E. 121 at 17, 21–26.)[18]

---

[18] Defendant Matulewicz also correctly argues that he is entitled to summary judgment on Plaintiff's hostile work environment claim brought pursuant to the NJLAD because he cannot be found liable under an aiding

Moreover, the City asserts the *Faragher*/*Ellerth*[19] affirmative defense, as it submits Plaintiff did not suffer a tangible adverse employment action; the Department exercised reasonable care to prevent and eliminate harassment; and Plaintiff unreasonably failed to avail herself of the Department's "preventive and corrective opportunities." (City Mov. Br. at 31–35.)

In response, Plaintiff argues that this Court should find the *Faragher*/*Ellerth* defense inapplicable because the Department failed to take appropriate corrective action and granted "virtually unchecked authority" to those with authority over Plaintiff. (D.E. 125 at 27–28.) Plaintiff asks this Court to consider the incidents' cumulative effect and the "totality of the circumstances" as sufficient to satisfy the "severe or pervasive" standard, (*id.* at 22–26), and submits the conduct was so severe and pervasive that this Court can find liability notwithstanding Plaintiff's promotion in 2022, (*id.* at 27–28).

After taking the incidents that would be admissible at trial into consideration, this Court concludes no reasonable jury could find that Defendants created a hostile work environment amounting to sexual harassment. A thorough examination of several of the incidents alleged by Plaintiff demonstrate that she was not subject to discrimination on the basis of sex. For example, as to Incidents Six and Seven, it is undisputed—and by Plaintiff's own admission—that other male officers were subject to the same treatment Plaintiff was subject to. (City SOMF ¶ 63; Union City Ex. B at 89.) *See Connell v. Nicholson*, 318 Fed. App'x 75, 77–78 (3d Cir. Mar. 26, 2009) (finding that male plaintiffs did not suffer discrimination on the basis of sex where their co-worker's behavior was directed towards both male and female employees). As to Incidents Eleven and Fifteen, Plaintiff was not sought out because of her sex, but rather because she was in violation of

---

and abetting theory of liability where Plaintiff has not established the City's liability under the NJLAD. (D.E. 121 at 16–17.)

[19] *Faragher v. City of Boca Raton*, 524 U.S. 775; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

Captain Botti's orders and was the only Powershift officer that had not checked in, respectively. (Union City Ex. Y at 591; Ex. EE at 27.)  And for Incident Eleven, Plaintiff could not recall whether there were other female or Powershift officers at the scene.  (Martinez Dep. 231:17–24.)

A review of the record in this case also debunks many of Plaintiff's version of events and severs the temporal connection between the incidents alleged, weakening support for finding that the conduct here was severe or pervasive.  For example, Plaintiff claims "Lieutenant Gaston refused [her] application to the FOP because she was a rat," (Incident Twenty-Three) (Martinez SOMF at 25), but Defendants put forth unrefuted evidence that during 2020, given the outbreak of COVID-19, all FOP meetings and elections were put on hold, which led to the delay in the processing of Plaintiff's application, (City SOMF ¶¶ 223–41).  Similarly, a review of the call transcripts for Incident Twenty-Four demonstrates that fellow officers did respond and ultimately arrived on the scene.  (Union City Ex. LL at 107.)  For almost all the incidents alleged, Plaintiff does not put forth evidence—other than her own testimony—demonstrating that Matulewicz's or the other officers' conduct "inject[ed] hostility or abuse into the working environment."[20]  *See Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017)).  In fact, for many of the incidents alleged, it was not Plaintiff, but the other officers involved, who were written up or received repercussions for their actions.

Additionally, the timing of the incidents does not support finding that the discrimination alleged was pervasive.  Fourteen incidents spanning approximately sixteen months suggests the incidents were more isolated in nature and not pervasive.  *See Caver*, 420 F.3d at 262 ("'[O]ffhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim.") (quoting *Faragher*, 524 U.S. at 788); *Nitkin*, 67 F.4th

---

[20] There are even some incidents for which Plaintiff could not identify the actors or when the occurrence took place.

at 571 (finding that one to two statements in a given six-month period did not amount to severe or pervasive harassment). *Cf. Woods-Pirozzi v. Nabisco Foods*, 675 A.2d 684, 693 (N.J. Super. Ct. App. Div. 1996) (concluding that sexist comments made "once or twice a week" over a one-year period satisfied the severe and pervasive standard).

Furthermore, even with more problematic instances, such as Incident One, Plaintiff does not set forth *how* the alleged discrimination detrimentally affected her. *See Ali*, 957 F.3d at 181 ("Utterances that are merely offensive do not rise to the level of unreasonably interfering with an employee's job performance."). Plaintiff's Second Amended Complaint claims she has suffered "severe emotional distress, depression, humiliation, embarrassment, and impaired self-esteem." (SAC ¶ 156.) Yet, there is nothing in the record substantiating this claim. When this Court inquired about this at oral argument, Plaintiff's counsel stated that Plaintiff had "lost considerable weight" and "suffered depression," and that Plaintiff's social worker's notes corroborated this. (OA Tr. 61:3–9.) However, the social worker was never previously identified as a witness, nor are the social worker's notes before this Court.

Overall, Plaintiff fails to make a *prima facie* case of hostile work environment and her claim fails on multiple elements.[21] Finding no genuine issue of material fact, summary judgment on Count I is granted.

## B. Retaliation (Count II)[22]

---

[21] As Plaintiff has not made a *prima facie* case of hostile work environment, this Court need not address the City's argument that it established the *Faragher/Ellerth* defense. *See Tavares v. Builders FirstSource Northeast Grp.*, No. 21-2964, 2023 WL 4248770, at *6 n.2 (D.N.J. June 29, 2023) ("Because the [c]ourt concludes that [p]laintiff cannot establish a *prima facie* case for his hostile work environment claims, it need not address the parties' arguments concerning [d]efendant's entitlement to an *Ellerth/Faragher* defense."); *Nitkin*, 67 F.4th at 573 n.5 (same).

[22] Given that "as a practical matter, the elements of a *prima facie* case of unlawful retaliation are essentially the same under Title VII and the NJLAD," this Court analyzes both simultaneously. *Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 423 n.13 (D.N.J. 2003); *see also Tourtellotte v. Eli Lilly & Co.*, 636 Fed.

Title VII prohibits an employer from discriminating against an employee because that employee has opposed any practice made unlawful by Title VII or because that employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). To state a *prima facie* case of retaliation, a plaintiff must show that: (1) "she engaged in a protected activity," (2) "suffered an adverse employment action," (3) and "there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (citing *Moore v. City of Phila.*, 461 F.3d 331 (3d Cir. 2006)). Under the *McDonnell Douglas*[23] burden-shifting framework, once a plaintiff makes a *prima facie* case, "the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Id.* If the employer makes this showing, the plaintiff must "convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)). At summary judgment, "a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id.*

Title VII's anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). To demonstrate "adverse employment action," a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a

---

App'x 831, 841 (3d Cir. Jan. 13, 2016) ("All retaliation and discrimination claims brought under Title VII and the NJLAD, including those based on sex, race, and disability, which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).")

[23] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

charge of discrimination." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington*, 548 U.S. at 68). For this inquiry "[c]ontext matters," yet the challenged conduct is examined "from the perspective of a reasonable person in the plaintiff's position." *Burlington*, 548 U.S. at 69, 71. Generally, "petty slights, minor annoyances, and simple lack of good manners" do not suffice. *Id.* at 68.

Courts consider "a broad array of evidence" when determining whether there is a causal connection. *Daniels*, 776 F.3d at 196 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). Temporal proximity between the protected activity and an employer's adverse action may be considered, but only where "unusually suggestive." *Id.* Absent temporal proximity, courts consider "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting retaliatory animus." *Id.* To establish causation, a plaintiff must put forth evidence "that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Id.*

Plaintiff claims she was subject to "severe harassment, daily threats to her safety, wrongful disciplinary write-ups, and unwarranted targeting during routine job activities" as a result of submitting a PD-11 grievance to IA. (D.E. 125 at 30.) She argues that the perpetuation of the hostile work environment amounted to retaliation in and of itself. (D.E. 125 at 7–8.) Lastly, she maintains she has shown pretext and that the Department "attempted to downplay their acts by putting a promotion in Plaintiff's rear-view mirror." (*Id.* at 36–37.)

Defendants move for summary judgment on Count II, arguing that Plaintiff does not make a *prima facie* retaliation case because she (1) did not suffer an adverse employment action and (2) cannot show a causal connection between the protected activity and alleged adverse employment

action.  (City Mov. Br. at 40–43; D.E. 121 at 27.)  Defendants submit that "nothing done by the Department dissuaded Plaintiff from continuing to report incidents" and note Plaintiff was never disciplined and suffered little to no harm, such that any incidents following Plaintiff's reports were not materially adverse.  (City Mov. Br. at 40–41.)  As to causation, Defendants argue there is neither temporal proximity nor a pattern of ongoing antagonism following Plaintiff's reporting.  (City Mov. Br. at 41–43; D.E. 121 at 30–31.)  Even if Plaintiff could meet her initial burden, Defendants contend, her claim still fails because she cannot show evidence of pretext.  (City Mov. Br. at 43–44; D.E. 121 at 32.)

It is undisputed that Plaintiff engaged in protected activity:  complaining of harassment. This Court considers July 2, 2020 as the logical starting point from which to assess whether subsequent incidents were carried out as a form of retaliation, as this was when Plaintiff made an official report by submitting a PD-11 to Chief Luster.  *See Burlington*, 548 U.S. at 69 ("[T]he standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.").

Plaintiff fails to make a *prima facie* case of retaliation.  As this Court considers evidence for those admissible incidents postdating the July 2, 2020 date, it finds those remaining incidents[24] demonstrate that Plaintiff did not suffer an adverse employment action and/or that there is no causation.  The post-reporting incidents do not demonstrate an "adverse employment action."  For Incidents Ten, Twelve through Fifteen, Twenty-One, Twenty-Four, and Twenty-Five, the record shows that Plaintiff either notified superiors or filed a report with IA; those superiors or IA then investigated; and that other officers were often reprimanded following the investigation.  Thus, a reasonable worker in Plaintiff's position would not have felt dissuaded from making or supporting

---

[24] This Court considers Incidents Ten through Fifteen, Nineteen, Twenty-One, Twenty-Four, and Twenty-Five in its retaliation analysis ("the post-reporting incidents").

a charge of discrimination, particularly when superiors were attentive to, and often addressed, the complaints being made as they arose. *See Daniels*, 776 F.3d at 195.

Assuming an adverse employment action, Plaintiff's retaliation claim still fails given her inadequate showing of causation. First, the timing of the post-reporting incidents is not "unusually suggestive," as these incidents span from one to eleven months after Plaintiff filed the July 2, 2020 PD-11. *Compare Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days found unduly suggestive), *and Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (seven days found temporally proximate enough to be suggestive), *with Schummer v. Black Bear Distrib., LLC*, 965 F. Supp. 2d 493, 499 (D.N.J. 2013) (concluding one month is not an unusually suggestive amount of time).

Second, the record as a whole does not reveal a pattern of antagonism or other evidence suggesting retaliatory animus, particularly because there is no evidence linking the actors behind some of the post-reporting incidents to Defendants. For example, despite investigating, it is still unknown who was behind the writings in the bathroom (Incidents Twelve and Thirteen) and who sent the pictures in the mass group text (Incident Twenty-One), let alone that whoever was responsible knew of Plaintiff's reporting. *See Daniels*, 776 F.3d at 196. Further, for several of the post-reporting incidents, Defendants have put forth evidence that Plaintiff was singled out not because of her protected activity, but because she was found in violation of orders/directives.

Lastly, Defendants have also put forth evidence demonstrating a lack of retaliatory animus for other incidents. To illustrate, the record shows that when Lieutenant Matulewicz checked on Plaintiff's detail on September 24, 2020, he had been instructed to do so by Inspector Wolpert and that he checked seven other detail locations (Incident Fourteen). Similarly, the record revealed that Mayor Stack's instruction that officers should "get off their cell phones," was appropriate

given that Officer De Fazio later admitted, and security footage showed, that he was using his phone (Incident Twenty-Five).

Ultimately, Plaintiff fails to make a *prima facie* case of retaliation given her inability to show that she suffered an adverse employment action and that there was a causal connection between her reporting the alleged harassment and the adverse action.[25]  *See Carvalho-Grevious*, 851 F.3d at 257.  Accordingly, Count II fails as a matter of law and Defendants are entitled to summary judgment.

## V.   <u>CONCLUSION</u>

In sum, this Court finds Defendants have met their initial burden of demonstrating the absence of a genuine issue of material fact as to Plaintiff's hostile work environment and retaliation claims.  Despite having numerous years and several extensions to conduct discovery, Plaintiff still relies solely on her own speculative assertions to support her claims.  At the summary judgment stage this is simply insufficient.  *See Jutrowski*, 904 F.3d at 288.  Finding that Plaintiff has failed to demonstrate a genuine issue of material fact, this Court concludes that Defendants are entitled to judgment as a matter of law.  *See Celotex*, 477 U.S. at 323.

For the reasons stated above, Defendants' Motions are **GRANTED.**  Plaintiff's Second Amended Complaint is **DISMISSED WITH PREJUDICE**.  An appropriate order follows.


_____
/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

---

[25] This Court declines to further address the burden-shifting mode of analysis.

Orig:  Clerk
cc:    Parties
        André M. Espinosa, U.S.M.J.